DAVID L. NARVER, JR., AND MARGARET B. NARVER, ET AL.,[1] PETITIONERS V. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4453–75, 4509–75, 4541–75, 4542–75, 4543–75, 5570–75, 5632–75, 5937–75, 8101–75, 8311–75, 8051–76, 8053–76, 8054–76, 8057–76, 8058–76, 8059–76, 8101–76, 8102–76, 8103–76, 9096–76.     Filed October 9, 1980.

*Robert P. Simpson, William M. Schindler,* and *Walter J. Cummings III,* for the petitioners.

*Louis A. Boxleitner* and *Marion K. Mortensen,* for the respondent.

---

[1]Cases of the following petitioners are consolidated herewith: William E. Monk and Marcia Monk, docket No. 4509–75; Richard E. Powers and Mary Louise Powers, docket No. 4541–75; Merel E. Powers and Gloria Powers, docket No. 4542–75; Lee B. Gold and Donna Gold, docket No. 4543–75; Robert J. Leonard and Bette K. Leonard, docket No. 5570–75; Kenneth M. Bowman and Tamara S. Bowman, docket No. 5632–75; Estate of Jack K. Moore, Deceased, Ruth Moore Caruthers (formerly Ruth A. Moore) and Lloyds Bank California (formerly First Western Bank & Trust Co.), Coexecutors, Jack K. Moore Trust, Lloyds Bank California (formerly First Western Bank & Trust Co.) and Ruth Moore Caruthers (formerly Ruth A. Moore), Cotrustees, and Ruth Moore Caruthers (formerly Ruth A. Moore), Individually, docket No. 5937–75; Robert S. Smith, docket No. 8101–75; Leroy A. Miller, Helen L. Miller, and Frances A. Miller, docket No. 8311–75; Estate of A. Justin Williams, Deceased, Carolyn H. Williams, Executrix, and Carolyn H. Williams, docket No. 8051–76; Tom M. Fullenlove and Sally W. Fullenlove, docket No. 8053–76; Laurence R. Schechter and Robin W. Schechter, docket No. 8054–76; John R. Bryan and Betty K. Bryan, docket No. 8057–76; Bryan D. Lee, docket No. 8058–76; Ruth L. Steig Pease, docket No. 8059–76; Wayne L. Campbell and Marie J. Campbell, docket No. 8101–76; Frank R. Tavel and Janis R. Tavel, docket No. 8102–76; James R. Lynch and Shirley S. Lynch, docket No. 8103–76; Newell E. Wood and Gladys Wood, docket No. 9096–76.

FAY, *Judge:* These consolidated cases were tried before Special Trial Judge Charles R. Johnston pursuant to Rules 180 and 182, Tax Court Rules of Practice and Procedure. His report was filed on October 12, 1979, and exceptions to the report were subsequently filed by the parties. The Court has duly considered those exceptions and has given appropriate weight to the findings of fact recommended by Special Trial Judge Johnston. See Rule 182(c) and (d), and the accompanying note, Tax Court Rules of Practice and Procedure, 60 T.C. 1057, 1149–1150 (1973).

Respondent determined the following deficiencies in petitioners' Federal income taxes:

| Docket Nos. | Petitioners | Taxable years | Deficiencies |
|---|---|---|---|
| 4453–75 | David L. Narver, Jr | 1967 | $1,137.00 |
| | Margaret B. Narver | 1967 | 1,170.00 |
| | David L. Narver, Jr | 1968 | 999.00 |
| | Margaret B. Narver | 1968 | 1,018.00 |
| | David L. Narver, Jr | 1969 | 1,042.00 |
| | Margaret B. Narver | 1969 | 1,053.00 |
| | David L. Narver, Jr., and Margaret B. Narver | 1970 | 1,647.85 |
| 4509–75 | William E. Monk and Marcia Monk | 1968 | 2,865.08 |
| | | 1969 | 1,321.00 |
| | | 1970 | 1,307.00 |
| 4541–75 | Richard E. Powers and Mary Louise Powers | 1967 | 4,085.00 |
| | | 1968 | 8,165.00 |
| | | 1969 | 3,471.00 |
| | Richard E. Powers and Mary L. Powers | 1970 | 2,359.37 |
| 4542–75 | Merel E. Powers and Gloria Powers | 1967 | 4,161.00 |
| | | 1968 | 8,288.00 |
| | | 1970 | 3,156.00 |
| 4543–75 | Lee B. Gold and Donna Gold | 1968 | 4,384.00 |
| | | 1969 | 1,796.00 |
| | | 1970 | 1,330.25 |
| 5570–75 | Robert J. Leonard and Bette K. Leonard | 1967 | 2,699.22 |

| Docket Nos. | Petitioners | Taxable years | Deficiencies |
|---|---|---|---|
| | | 1968 | $1,669.42 |
| | | 1969 | 1,917.98 |
| | | 1970 | 1,198.54 |
| 5632–75 | Kenneth M. Bowman and Tamara S. Bowman .................. | 1968 | 14,788.00 |
| | Tamara S. Bowman..................... | 1969 | 32,964.00 |
| | | 1970 | 18,065.00 |
| 5937–75 | Estate of Dr. Jack K. Moore, deceased, Ruth A. Moore and First Western Bank & Trust Co., coexecutors, and Ruth Moore Caruthers, surviving wife........... | 1968 | 9,662.00 |
| | Estate of Dr. Jack K. Moore, deceased, Ruth A. Moore and First Western Bank & Trust Co., coexecutors ............................. | 1969 | 3,090.00 |
| | Ruth Moore Caruthers (formerly Ruth A. Moore) .......... | 1969 | 3,592.00 |
| | Jack K. Moore Trust .................. | 1970 | 209.00 |
| | Ruth A. Caruthers (formerly Ruth A. Moore) .......... | 1970 | 840.88 |
| 8101–75 | Robert S. Smith......................... | 1965 | 1,050.46 |
| | | 1966 | 2,776.65 |
| | | 1967 | 19,198.46 |
| | | 1968 | 18,870.61 |
| | | 1969 | 49,704.72 |
| | | 1970 | 19,569.42 |
| 8311–75 | Leroy A. Miller and Helen L. Miller ........................ | 1965 | 1,310.82 |
| | Leroy A. Miller and Frances A. Miller...................... | 1966 | 29,775.06 |
| | | 1967 | 42,578.93 |
| | | 1968 | 63,635.33 |
| | | 1969 | 60,343.73 |
| | | 1970 | 50,365.43 |
| 8051–76 | A. Justin Williams and Carolyn H. Williams.................. | 1967 | 7,409.77 |
| | | 1968 | 10,375.76 |
| | | 1969 | 7,650.00 |
| | | 1970 | 5,189.00 |

| Docket Nos. | Petitioners | Taxable years | Deficiencies |
|---|---|---|---|
| 8053–76 | Tom M. Fullenlove and Sally W. Fullenlove | 1967 | $6,901.64 |
| | | 1968 | 6,882.31 |
| | | 1969 | 12,854.62 |
| | | 1970 | 7,307.00 |
| 8054–76 | Laurence R. Schechter and Robin W. Schechter | 1968 | 3,840.67 |
| | | 1969 | 1,563.25 |
| | | 1970 | 1,210.60 |
| 8057–76 | John R. Bryan and Betty K. Bryan | 1967 | 3,339.19 |
| | | 1968 | 7,779.39 |
| | | 1969 | 4,673.19 |
| | | 1970 | 3,997.64 |
| 8058–76 | Bryan D. Lee | 1968 | 3,248.53 |
| | | 1969 | 1,424.31 |
| | | 1970 | 950.05 |
| 8059–76 | Ruth L. Steig Pease | 1968 | 3,172.00 |
| | | 1969 | 1,254.00 |
| | | 1970 | 1,072.00 |
| 8101–76 | Wayne L. Campbell and Marie J. Campbell | 1968 | 5,574.80 |
| | | 1969 | 4,775.19 |
| | | 1970 | 3,298.81 |
| 8102–76 | Frank R. Tavel and Janis R. Tavel | 1968 | 4,091.00 |
| | | 1969 | 1,786.00 |
| | | 1970 | 890.00 |
| 8103–76 | James R. Lynch and Shirley S. Lynch | 1968 | 3,185.38 |
| | | 1969 | 1,519.89 |
| | | 1970 | 1,011.74 |
| 9096–76 | Newell E. Wood and Gladys Wood | 1967 | 9,143.00 |
| | | 1968 | 21,793.00 |
| | Newell E. Wood | 1969 | 13,224.00 |
| | Gladys Wood | 1969 | 13,224.00 |
| | Newell E. Wood | 1970 | 9,372.00 |
| | Gladys Wood | 1970 | 9,211.00 |

This case involves (1) the sale of a building in San Diego, Calif. (hereinafter the 861 Building) by Jack R. Young & Associates, Inc. (hereinafter JRYA), to two limited partnerships, Seventh Property Associates (hereinafter 7th P.A.), and Eleventh Property Associates (hereinafter 11th P.A.) in which JRYA was the general partner; (2) the lease, with an option to purchase, of the site on which the 861 Building was located by JRYA to 7th P.A. and 11th P.A.; (3) and the lease of the 861 Building and the sublease of the building site by 7th P.A. and 11th P.A. to Cambridge Management Corp. (hereinafter CMC), a wholly owned subsidiary of JRYA.

The principal issue for decision in these cases is whether petitioners, limited partners in 7th P.A. and 11th P.A., are entitled to deduct their distributive shares of claimed partnership losses. This issue arises in the context of the above-mentioned sale and leases. The claimed losses were attributable to the excess of depreciation and interest expense over rental income from the 861 Building. A decision for petitioners on the principal issue would require a determination of an alternative issue raised by respondent, whether the partnerships' basis in the 861 Building is limited by section 752(c)[2] to its fair market value on December 29, 1967.

The issues arising out of petitioners' interests in 7th P.A. and 11th P.A. were severed for trial in this consolidated proceeding.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

All the individual petitioners herein, except Tamara S. Bowman, were residents of California at the time their petitions were filed. Petitioner Tamara S. Bowman was a resident of Hawaii when she filed her petition. The principal place of business of Lloyds Bank California (formerly First Western Bank & Trust Co.) at the time the petition in docket No. 5937–75 was filed was Pasadena, Calif.

Jack R. Young & Associates, Inc. (JRYA), was incorporated under the laws of California on May 11, 1966. Jack R. Young (hereinafter Young) owned approximately 67 percent of the

---

[2]All statutory references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable years in issue.

outstanding shares of stock of JRYA and was president from its organization until late 1969. At that point, Kenneth Darling replaced him as president of JRYA, and Young became chairman of the board. The name of JRYA was changed to Young Properties Corp. (hereinafter YPC) on or about August 13, 1971. At all times relevant to this case, the shareholders of JRYA were as follows:

| Name | Number of shares |
|---|---|
| Jack R. Young | 1,650 |
| Kenneth L. Darling, Jr | 200 |
| Raymond A. Wensink | 110 |
| Leroy Miller | 70 |
| Norman L. Jones | 65 |
| Stewart S. McLeod | 50 |
| Robert S. Smith | 50 |
| John T. Alexander | 50 |
| Philip L. Taylor | 50 |
| Jere J. Nelson | 50 |
| Carl Lipschultz | 50 |
| Earl Christofferson | 30 |
| George Watwood | 20 |
| Russell E. Lurcook | 10 |
| Clyde Jensen | 5 |

Cambridge Management Co. (CMC) was incorporated under the laws of the State of California on December 7, 1966. CMC was a wholly owned subsidiary of JRYA, with invested capital in the stated amount of $10,000.

Seventh Property Associates (7th P.A.), a limited partnership, was formed under an agreement dated December 29, 1967, pursuant to the California Uniform Limited Partnership Act. The partnership was composed of one corporate general partner, JRYA, and five individual limited partners. The partners in 7th P.A., their capital contributions, and their percentage interests in the partnership were as follows:

| Name | Percentage | Capital contribution |
|---|---|---|
| General partner | | |
| JRYA | 0 | 0 |
| Limited partners | | |
| Leroy A. Miller | 40 | $24,000 |

| | | |
|---|---|---|
| David L. Narver, Jr | 10 | $6,000 |
| Robert J. Leonard | 10 | 6,000 |
| Robert S. Smith | 10 | 6,000 |
| Newell E. Wood | 30 | 18,000 |
| Totals | 100 | 60,000 |

All of these limited partners are petitioners herein.

The formation of 7th P.A. was evidenced by two documents, a "Limited Partnership Agreement" and a "Certificate of Limited Partnership of Seventh Property Associates." The Certificate of Limited Partnership of Seventh Property Associates is dated December 29, 1967, and was recorded with the San Diego County Recorder on January 19, 1968.

The limited partnership agreement, also dated December 29, 1967, was executed in counterparts by JRYA and each of the limited partners. The agreement gave JRYA, as general partner, full power to manage the affairs of 7th P.A. It also provided that the general partner would at all times keep, or cause to be kept, full and true books of account for the partnership. The general partner was further required to prepare and transmit to the limited partners an annual report in addition to the annual partnership income tax return. The agreement provided that 7th P.A. would acquire a one-third interest in the 861 Building, a San Diego office building.

By an agreement dated January 15, 1968, JRYA caused Eleventh Property Associates (11th P.A.) to be formed pursuant to the California Limited Partnership Act. Eleventh P.A. was composed of 1 general partner, JRYA, and 19 limited partners, all of whom were individuals.

The partners in 11th P.A., their capital contributions, and their percentage interests in the partnership were as follows:

| Name | Percentage | Capital contribution |
|---|---|---|
| General partner | | |
| JRYA | 0 | 0 |
| Limited partners | | |
| Tamara S. Bowman | 10 | $12,000 |
| John R. Bryan | 10 | 12,000 |
| Wayne L. Campbell | 10 | 12,000 |
| Tom M. Fullenlove | 5 | 6,000 |

| | | |
|---|---|---|
| Lee B. and Donna Gold | 5 | $6,000 |
| Bryan D. Lee | 5 | 6,000 |
| James R. Lynch | 5 | 6,000 |
| William E. Monk | 5 | 6,000 |
| Jack K. and Ruth A. Moore | 10 | 12,000 |
| M. E. and Gloria Powers | 5 | 6,000 |
| R. E. and Mary Louise Powers | 5 | 6,000 |
| Laurence R. Schechter | 5 | 6,000 |
| Ruth L. Steig | 5 | 6,000 |
| Frank R. Tavel | 5 | 6,000 |
| A. Justin Williams | 10 | 12,000 |
| Totals | 100 | 120,000 |

All of the above-named limited partners in 11th P.A. are petitioners joined in this proceeding, except Jack K. Moore and A. Justin Williams, both of whom are now deceased and whose estates are petitioners joined in this proceeding. Ruth L. Steig, having since married, is now known as Ruth L. Steig Pease.

The formation of 11th P.A. was evidenced by two documents, a "Limited Partnership Agreement" and a "Certificate of Limited Partnership of Eleventh Property Associates." The certificate of limited partnership, dated January 15, 1968, was recorded with the San Diego County Recorder on May 10, 1968.

The limited partnership agreement was also dated January 15, 1968, and was executed in counterparts by JRYA and individually by the limited partners. This agreement had provisions similar to those for 7th P.A. with respect to the powers and duties of JRYA as general partner, including the keeping and preservation of financial records and the furnishing of an annual report to the limited partners. It also provided that 11th P.A. was to acquire a two-thirds interest in the 861 Building.

The office building which is the subject matter of the primary transaction involved in this case, located at 861 Sixth Avenue in downtown San Diego, Calif., was on the south side of E Street between Sixth and Seventh Avenues. Immediately to the east of the 861 Building was an adjoining area referred to as the "parking lot land," on which stood a single-story garage. The building, the building site, and the parking lot land are hereinafter collectively referred to as the "861 Property." The 861 Building faced Sixth Avenue, and the northern side of the

building faced E Street. The parking lot land and the building site each occupied an area of 100 feet by 125 feet.

Constructed in 1910 as an office building, the 861 Building was a reinforced concrete structure consisting of eight stories, a basement, and a ninth floor penthouse. In 1923, the 861 Building and the underlying land were acquired by the San Diego Gas & Electric Co. (hereinafter SDG & E) for use as its corporate headquarters. Over the years, SDG & E added to the property, remodeled portions of the building, and generally provided good maintenance. While it was the owner, SDG & E occupied virtually all the space in the building. Because the building had a central open court above the ground floor, the gross area of the seven upper floors was less than that of the first floor. The 861 Building was 55 years old on October 10, 1965, and was then 90-percent depreciated for age-life purposes.

Sometime in the 1960's, SDG & E decided to undertake the construction of a new high rise office building for use as its headquarters and to offer the 861 Property for sale. It employed John Cotton, who was an independent real estate appraiser, broker, and manager familiar with San Diego property values, to appraise the property, including the 861 Building, building site, and parking lot land. On October 10, 1965, Cotton submitted to SDG & E his report of the fair market value of the 861 Property at that date. He concluded as follows:

861 Building and building site ................ $375,000
Parking lot land and garage .................. 180,000
   Total[3] .......................................... 555,000

Cotton allocated $230,000 of the $375,000 to the building site and $145,000 to the 861 Building, itself. The value of the parking lot land, including the garage, was $180,000, of which $170,000 was allocable to the land and $10,000 to the garage structure. However, Cotton expressed the view that if the property were left on the market for a period of more than 6 months, a higher price could be obtained from a purchaser with a special use in mind.

Ground was broken for the new SDG & E building in

[3]Cotton's report also contained an appraisal of an electric power substation which was adjacent to but not included in the 861 Property. No interest in the substation was transferred in any of the transactions relevant to this case.

September 1966. In the meantime, in late 1965 or early 1966, SDG & E had listed the 861 Property for sale with a real estate brokerage firm in San Diego. On July 1, 1966, SDG & E sold the 861 Property in an arm's-length transaction to the Sutherland Foundation (hereinafter the foundation) for $700,000 in cash. A family foundation, the foundation was a nonprofit corporation devoted to educational, religious, and cultural affairs. A. J. Sutherland, a retired banker, was the president of the foundation on July 1, 1966.

The agreement between the foundation and SDG & E for the purchase of the 861 Property was contingent upon the execution of a lease of the property by the foundation to SDG & E. The foundation would not have purchased the 861 Property were it not for the leaseback to SDG & E. In fact, such a lease was a condition of the bank-financing the foundation was able to arrange. Concurrent with the transfer to the foundation of title in the 861 Property, SDG & E leased the property from the foundation for a term of 4 years. (This lease is hereinafter referred to as the SDG & E lease.) SDG & E was given the right to cancel the lease after 27 months, i.e., after September 30, 1968. The lease was a net lease; SDG & E as lessee was to pay all utilities, taxes, and maintenance expenses. The rent was $15,645 per month for the first 27 months of the lease and $10,430 monthly for the remaining lease term.

To finance the purchase price of $700,000, the Sutherland Foundation obtained a loan of $466,000 from the Security First National Bank.[4] The bank appraised the value of the property to be $700,000 for loan purposes.[5] Its appraisal report noted that the property was, to a certain extent, special purpose property which would require some remodeling for multiple tenant occupancy. The foundation executed a promissory note, bearing interest at a 6½-percent annual rate, to Security First National Bank in the amount of $466,000. The note was payable in

---

[4]Sutherland had been president of Security Trust & Savings Bank in San Diego from 1945 until 1957, when it was merged with Security First National Bank of Los Angeles. As bank president, Sutherland reviewed all real estate loans and other loans that were made. Security Trust & Savings Bank had been a major bank in San Diego, and Sutherland was thoroughly acquainted with real estate in the city and county of San Diego.

[5]This appraisal, made on June 27, 1966, by R. H. Rodgers, vice president of the appraisal department of Security First National Bank, allocated $240,000 of the $700,000 to the 861 Building.

monthly installments of $15,645, which equaled the monthly rental to be paid by SDG & E. Any unpaid principal and interest on the note was due on October 1, 1968. The foundation executed a deed of trust conveying the 861 Property to the bank as security for the note and assigned to the bank both the SDG & E lease and all rents payable thereunder.

From the outset, Sutherland planned to dispose of the foundation's interests in the 861 Property before the optional termination date of the SDG & E lease. Sutherland did not expect to be able to rent the property for $15,645 a month after the termination of the lease. In the period between April 1967 and October 1967, Sutherland contacted a large number of prospective purchasers, including various governmental agencies and educational institutions. The foundation's asking price was $700,000. Sutherland wrote to 90 life insurance companies offering to lease or sell the 861 Property. He also endeavored to sell it to various charitable organizations and to the San Diego Chamber of Commerce. All of Sutherland's attempts to sell or lease the property were unsuccessful.

Subsequently, Sutherland was approached by Percy H. Goodwin & Co. (hereinafter Goodwin), a real estate company which claimed to have several prospective buyers. On October 31, 1967, the foundation gave Goodwin an exclusive 90-day contract to sell the property. Because of the lack of interest in the property at $700,000, the contract set the listing price for the first 60 days at the reduced amount of $650,000. Between December 31, 1967, and January 31, 1968, the price was to be further reduced to $635,000.

It appears from the record that Goodwin did not produce a buyer and that in November 1967 JRYA began negotiations with the foundation through a Mr. Bert Fisher.[6] On December 29, 1967, the foundation sold the 861 Property to JRYA for the sum of $650,000.

JRYA executed a promissory note dated December 4, 1967, payable to the foundation for the principal sum of $650,000. The note provided for interest at the annual rate of 6 percent from October 1, 1968, until October 1, 1973, and 6½ percent from

---

[6]The record does not make clear Fisher's role in the light of the 90-day exclusive contract. However, Sutherland did agree to pay Fisher $34,000 upon the successful completion of the sale.

October 1, 1973, until October 1, 1988, at which time the unpaid principal balance and accrued interest would be due and payable. The note further provided that the foundation would receive $140,805 in the form of an assignment of rent payable under the SDG & E lease.[7] Of this assigned rent, $95,000, together with $100,000 to be paid by JRYA at the close of escrow, was to be considered as prepaid interest on the note. The balance of the assignment of rent, $45,805, was to be treated as a payment of principal. The note provided that a $1,500 payment, wholly of principal, would be made each month during the period from October 1, 1968, until October 1, 1973, when monthly payments of principal and interest in the amount of $4,480 would become payable. JRYA's note to the foundation was secured by a deed of trust.

By an instrument dated December 28, 1967, the foundation assigned to JRYA all of its interest in the SDG & E lease. JRYA immediately assigned back to the foundation the first $140,805, as required by the promissory note, of the rent collected under the SDG & E lease; $45,805 of this amount was to be applied to principal on the JRYA note and $95,000 was to be treated as prepaid interest.

The purchase and sale transaction between the foundation and JRYA was handled in an escrow which was closed on December 29, 1967. On that date, the grant deed of the foundation to JRYA was recorded in San Diego County, Calif. The foundation was obligated to pay the documentary stamp tax of $715 in the transaction and paid this amount. On behalf of JRYA, Jack Young and Kenneth Darling instructed the escrow agent to affix an additional $935 in documentary stamps to the deed from the foundation to JRYA, and deposited funds for the additional stamps. As a result, a total of $1,650 in documentary stamps was affixed to the foundation's grant deed to JRYA. This was the amount of documentary stamp tax due on a transaction valued at $1,500,000. In contrast, SDG & E had paid a documentary stamp tax of $770 on its earlier sale of the 861 Property to the foundation.

Also recorded on December 29, 1967, was a document entitled "Deed of Trust and Assignment of Rents" which had been

---

[7]This amount constituted the total rent SDG & E was to pay through Sept. 30, 1968, after which date its right to cancel the lease would become effective.

executed by JRYA and which assigned all of JRYA's interest in the 861 Property and all rents received from the property to secure the $650,000 note to the foundation.

At the time of the closing of the transaction between the foundation and JRYA, the foundation deposited $158,650 of its funds into the escrow. This was applied to paying off the balance due on the indebtedness of the foundation to Security First National Bank. The bank then released its interest in the 861 Property under the deed of trust given by the foundation. The bank also reassigned to the foundation all of its interest in the SDG & E lease.

In its corporate income tax returns for its fiscal years ended in 1968, 1969, and 1970, JRYA reported the installment sale of the 861 Building. In those returns, JRYA reported that its cost of the building was $341,725.

In a document entitled "Sales Agreement" and dated December 30, 1967, JRYA agreed to sell the 861 Building to 7th P.A. and 11th P.A.[8] The sales agreement was executed by Young as president of JRYA, seller, and by Darling as vice president of JRYA, general partner in 7th P.A. and 11th P.A., buyers. The sales agreement recited that "Seller [JRYA] hereby agrees to sell and Buyer [7th P.A. and 11th P.A.] agrees to buy" the building, 861 Sixth Avenue, only, and not the land upon which it is located. The sales price was fixed at $1,800,000 with an initial payment to the seller of $180,000 as prepaid interest on the purchase price. Interest at the rate of 7 percent was to be paid on the unpaid balance of the purchase price, which was to be amortized over a period of 20 years. The sales agreement provided that as long as any portion of the purchase price remained unpaid, the buyers would have "no responsibility for costs in connection with the ownership of the building other than the payment of the purchase price." JRYA as seller agreed "to be responsible for, without limitation, taxes and maintenance expenses." It was also agreed that such other documents as might be required to give force and effect to the agreement would be executed by the parties. The seller had the power to refinance the existing obligations against the property. The

---

[8]Eleventh P.A. was apparently not yet in existence. Its certificate of limited partnership, which was dated Jan. 15, 1968, was not recorded with the San Diego County Recorder until May 10, 1968.

agreement provided for variation or modification of its terms "only by an instrument in writing, duly executed by the parties, of even or subsequent date herewith." It was not revoked by any agreement of even or subsequent date.

The sales agreement was drafted in late 1967 by Wilford D. Willis, an attorney practicing in the San Diego area. Willis, counsel to JRYA from July 1967 until October 31, 1973, became a director and the secretary of JRYA in 1969 or 1970.

Another agreement, dated December 29, 1967, and entitled "Agreement of Purchase and Sale of Real and Personal [sic] and Installment Land Contract to Create Security Interest in Real Property for Purchase Price of Combined Real and Personal Property" (hereinafter agreement of purchase) was also executed by JRYA on behalf of itself on one hand and 7th P.A. and 11th P.A. on the other hand. Darling signed for all parties. The jurats attached to the agreement of purchase stated that Darling in his various capacities had appeared before a notary public in San Diego on December 29, 1967, and acknowledged his multiple signatures to the agreement. The notary public was also an officer of JRYA.

The agreement of purchase provided for the sale of an undivided one-third interest in the 861 Building to 7th P.A. and an undivided two-thirds interest to 11th P.A. The agreement set the total purchase price at $1,800,000 together with 7-percent annual interest on the unpaid balance, to be paid as follows:

(a) $180,000 upon the execution of the agreement as prepaid interest;

(b) $4,600 per month for the first 12 months, to be applied wholly to principal;

(c) $10,313 per month for the 13th through the 17th month, principal only;

(d) $10,313 per month for the 18th through the 24th month, principal and interest; and

(e) $15,000 per month for the 25th month through completion of the contract, principal and interest.

In contrast to the sales agreement, the agreement of purchase provided that 7th P.A. and 11th P.A., as buyers, would pay all taxes levied or assessed against the 861 Building and would keep it insured for the amount of the purchase price. Insurance proceeds were to be paid to JRYA, as seller, to the extent of the

unpaid principal owed by the limited partnerships. In the event that 7th P.A. and 11th P.A. should fail to pay such taxes and insurance premiums, JRYA, as seller, could declare the buyers to be in default under the contract and could utilize its power of sale. The agreement of purchase provided that risk of loss for partial or total destruction of the building was on the buyers. Any condemnation award or damages recovered from a third person by the buyers or seller were required to be apportioned between the parties.

As seller, JRYA acknowledged that the indebtedness under the agreement of purchase was a purchase-money debt under California law so that 7th P.A. and 11th P.A. would not be personally liable for the indebtedness. JRYA also received the right to encumber the 861 Building with further loans, not to exceed in the aggregate the amount due from 7th P.A. and 11th P.A. under the agreement of purchase.

Although the agreement of purchase was dated December 29, 1967, it was drafted (along with other instruments discussed below) in late 1968 by a real estate attorney hired by Wilford D. Willis to review the key documents in the sale-leaseback transaction. Young and Darling, who were the only signatories to the two sale documents, intended the agreement of purchase to supersede the sales agreement. Nevertheless, it did not by its terms revoke the sales agreement dated December 30, 1967. The agreement of purchase shifted to 7th P.A. and 11th P.A. the obligation to pay taxes and other assessments. It also required the partnership to keep the building and the personal property therein insured for $1,800,000. Unlike the sales agreement, the agreement of purchase did not require JRYA as seller to be responsible for other costs, including maintenance and expenses. However, no expenses appear as deductions on the partnerships' tax returns for the years 1968 through 1972 other than depreciation, interest, and land rent.

At some unknown date in 1970, it was determined that the payment schedule set forth in the agreement of purchase provided for monthly payments which were approximately $1,000 greater than the amount required to amortize the purchase price over 20 years at 7-percent interest. Therefore, JRYA and 7th P.A. and 11th P.A. subsequently executed a document entitled "Amendment to Agreement" entered into "as of December 29, 1967," for the stated purpose of correcting the

arithmetical error in the schedule of payments contained in the agreement of purchase and conforming that schedule to the intent and actions of the parties. Under the amendment to agreement, the purchase price was to be paid as follows:

(a) $180,000 upon the execution of the agreement of purchase;

(b) $3,600 per month for the first 17 months, to be applied wholly to principal;

(c) $9,756 in the 18th month, to be applied to principal and interest; and

(d) $14,000 per month for the 19th month through the completion of the contract, to be applied to principal and interest.

Neither the agreement of purchase nor the sales agreement stated or indicated that the rents payable by SDG & E under the SDG & E lease had been assigned by JRYA to the foundation in partial payment of JRYA's purchase obligation to the foundation. There is no evidence that the persons who became limited partners in 7th P.A. and 11th P.A. were informed of this prior assignment of the SDG & E rents.

The $60,000 capital contribution of the limited partners in 7th P.A. and the $120,000 capital contribution of the limited partners in 11th P.A., which had been deposited by JRYA as general partner in a trust account or accounts, were credited by JRYA (the seller) as prepaid interest on the $1,800,000 purchase price of the 861 Building. The total of $180,000 represented the first 17 months' interest under the payment program set out in the agreement of purchase.

In a document designated "Land Lease and Option to Purchase" (hereinafter land lease) and dated December 29, 1967, JRYA leased to 7th P.A. and 11th P.A. the building site on which the 861 Building was located. According to this document, JRYA leased an undivided one-third interest in the land to 7th P.A. and an undivided two-thirds interest to 11th P.A. The lease provided that 7th P.A. and 11th P.A. would pay all taxes and assessments levied against the property. The term of the land lease was 10 years, ending December 31, 1977, and the monthly rent was $1,000 throughout the lease term. The land lease granted the lessees eight options to renew the lease for periods of 5 years each after the expiration of the original 10-year term. The rent during each renewal term was to be $1,000, plus a cost of living

adjustment at the beginning of each 5 year renewal period. JRYA also consented to one assignment or sublease of the land lease. The lease was executed by Darling for all parties, and the jurats attached to the lease stated that he appeared before the acknowledging notary public on December 29, 1967.

The land lease also gave 7th P.A. and 11th P.A. an option to purchase the building site. Preconditions to the exercise of this option were the payment of all rents, taxes, assessments, and other obligations required under the lease through November 29, 1977, and the making of all payments due under the contract for purchase of the 861 Building, itself, including the accelerated balance of the purchase price remaining on December 29, 1977.[9] Then 7th P.A. and 11th P.A. were entitled to exercise their option by giving the lessor notice of their intent to do so on or before November 30, 1977. The option price was $200,000.

Another document entitled "Land Lease and Option to Purchase" was executed by Darling on behalf of JRYA as lessor and JRYA for 7th P.A. and 11th P.A. as lessees. This version of the land lease also bore the date December 29, 1967; however, it was not drafted until late 1968, at about the same time as the agreement of purchase. Except for certain option terms, the provisions of the two versions of the land lease were virtually identical. In this second land lease, the price was to be set by a panel of three appraisers, but with a minimum price of $200,000. Notice of intent to exercise the option was to be given by November 1, 1977, under the second lease, together with assurances of the complete payment of all rents, taxes, building purchase payment, and other obligations. Escrow was to be closed by January 31, 1978, and the lessees were to have made all payments by then.

A short form of a land lease dated December 29, 1967, was recorded in San Diego County on December 20, 1968. The notary public acknowledged Darling's appearance before her on December 29, 1967, and his signatures on the short-form lease on behalf of all parties. The short-form lease does not indicate which version of the land lease it represents.

By a lease dated December 29, 1967, 7th P.A. and 11th P.A. leased the 861 Building (but not the underlying building site) to

---

[9]Under the agreement of purchase as amended, this amount would have been $1,184,004.

Cambridge Management Co. (CMC) for a 10-year term ending December 1977. CMC agreed to pay rent according to a schedule identical to the partnerships' schedule of installment payments to JRYA under the unamended agreement of purchase. Under this lease, CMC also agreed to pay all utilities, taxes, insurance premiums, and repair costs.

Another document, designated as "Master Lease of Real and Personal Property Exclusive of Land" (hereinafter master lease) and dated December 29, 1967, also leased the 861 Building to CMC. Under the master lease, CMC's rental payments were the amounts which the partnerships were to pay JRYA under the agreement of purchase, viz, the installment payments together with taxes and insurance obligations. A copy of the agreement of purchase was attached to the master lease as an exhibit. The lease was signed by Darling, both on behalf of JRYA as the general partner of 7th P.A. and 11th P.A., and on behalf of CMC. Although the master lease was drafted in late 1968, the jurats affixed to it stated that Darling's signatures in his various capacities were acknowledged before a notary on December 29, 1967. Again, the notary was an officer of JRYA.

Under an instrument captioned "Sublease of Ground Lease" and dated December 29, 1967, 7th P.A. and 11th P.A. subleased the building site to CMC for a term of 10 years. The partnerships did not assign their options under the land lease to purchase the building site or to extend the lease beyond 10 years. CMC agreed to pay, as rent, the amount required of the partnerships under the land lease.

The parking lot land which JRYA acquired from the foundation was not sold or leased to 7th P.A. and 11th P.A. JRYA leased it instead to CMC for a term of 10 years beginning December 29, 1967, at a rental of $500 a month. CMC as lessee agreed to pay all taxes and assessments on the property.

Although the original 27-month term of the SDG & E lease ended September 30, 1968, the lease was terminated early, effective May 15, 1968. In consideration for this early termination, SDG & E paid the foundation a sum of $41,430.

Young consented to the cancellation of the SDG & E lease and to the $41,430 payment. He also agreed to assign to the foundation future rents to be received from the Bank of California and the other tenants in the 861 Building until the total sum of $21,150 was paid to the foundation. Seventh P.A.

and 11th P.A. were not parties to the consent and assignment of rents, and there is no evidence that the limited partners of 7th P.A. and 11th P.A. were informed of this assignment to the foundation of the SDG & E payment and future rents. These amounts were assigned in a partial payment of the obligations of JRYA to the foundation and did not reduce the indebtedness of 7th P.A. and 11th P.A. to JRYA.

---

The area in which the 861 Building was located was in a state of general decline on December 29, 1967. The building was in the second block south of Broadway, which had once been a major retail street in downtown San Diego. However, in years prior to December 1967, retail business had been declining in the downtown area and moving to outlying portions of San Diego. As a result, downtown office buildings had high vacancy rates. Although the city adopted a redevelopment plan in 1965, the 861 Building was just outside the area covered by the plan. Construction of major new office and financial buildings in the 1960's was in the north and west portions of the redevelopment area, north of Broadway and away from the neighborhood of the 861 Building. Fifth Avenue, one block to the west of the 861 Building, was a commercial area of older buildings containing clothing stores, loan shops, movie houses, bars, and locker clubs which catered to a transient male population. The Maryland Hotel, a retirement hotel, was south of the 861 Building in the same block.

Prior to September 1969, the Security Pacific National Bank had its regional headquarters at Fifth and E Streets, about one block from the 861 Building. In August 1969, this bank moved its regional headquarters office to the north of Broadway because the area of Fifth and E Streets was deteriorating. The bank had difficulty selling its old headquarters building.

SDG & E vacated the 861 Building in May 1968, and CMC took over the operation of the building. At that time, the 861 Building had the following rentable area:

| Floor | Size | Gross area (sq. ft.) | Net rentable area (sq. ft.) |
|-------|------|----------------------|------------------------------|
| Basement | 137 × 112 | 15,344 | 6,643 |
| First | 125 × 100 | 12,500 | 10,210 |

| | | | |
|---|---|---|---|
| Second—less 2 light wells | 125 × 100<br>27 × 59<br>12 × 59 | 10,199 | 7,847 |
| Third | Same | 10,199 | 7,583 |
| Fourth | Same | 10,199 | 7,422 |
| Fifth | Same | 10,199 | 8,108 |
| Sixth | Same | 10,199 | 7,427 |
| Seventh | Same | 10,199 | 7,800 |
| Eighth | Same | 10,199 | 7,298 |
| Penthouse | 42 × 21 | 882 | 0 |
| | | 100,119 | 70,338 |

Only a portion of the 861 Building was air-conditioned on December 29, 1967. This included the first floor, a portion of the basement, a suite of offices on the eighth floor, and the board of directors room. Except for the eighth floor, the building was old-fashioned and did not constitute first-class office space. The office layouts were makeshift and not uniform. The building was approximately 57 years old on December 29, 1967, at which time its remaining useful economic life did not exceed 20 years.

After SDG & E vacated the 861 Building in May 1968, CMC, as lessee from 7th P.A. and 11th P.A., took over the operation of the building and began renting or making space available to various occupants. Some of the leases with tenants were short-term or terminable by the tenant. In the years 1968 through 1970, a number of occupants, some of which were charitable organizations, paid no rent for the space occupied by them. The following table indicates the tenants who were obligated to pay rent.

| Tenant | Occupancy date | Lease term | Lease terminable after |
|---|---|---|---|
| Bank of California | Aug. 1968 | 5 years | 2 years |
| Economic Opportunity Commission | June 1968 | 16 months | 4 years |
| General Services Administration (U.S. Bankruptcy Court) | Sept. 1968 | 5 years | |
| Coronado Cay Co. | Oct. 1968 | 6 months | |
| Davidson Jewelers Supply | June 1969 | 2 years | |
| H. L. Yoh | Oct. 1969 | Month to month | |
| Charles Porter | Nov. 1969 | 3 years | |

| B.M. & L.D. Cowan | Dec. | 1969 | Month to month |
| Golden State Theatrical Productions | Jan. | 1970 | Month to month |
| Youth Specialties | Feb. | 1970 | Month to month |
| Career Enterprises | June | 1970 | 3 years |

JRYA occupied space on the 8th floor of the 861 Building beginning in December 1968. Eighth floor space was the highest quality space in the building. Entries for rent paid by JRYA appear on the books of CMC.

CMC's data on the operation of the 861 Building in the fiscal years ended September 30, 1969 through 1973 were as follows:

| | FYE 9/30/69 | FYE 9/30/70 | FYE 9/30/71 | FYE 9/30/72 | FYE 9/30/73 |
|---|---|---|---|---|---|
| Gross rental income[10] | --- | $250,975 | $252,290 | $254,368 | $306,751 |
| Less: Vacancy loss | --- | 45,095 | 49,417 | 101,438 | 85,842 |
| Net rental before expenses | $178,720 | 205,880 | 202,873 | 152,930 | 220,909 |
| Less: Expenses[11] | 98,183 | 108,516 | 103,440 | 96,075 | 103,651 |
| Income from rents | 80,537 | 97,364 | 99,433 | 56,855 | 117,258 |

Taking into account estimated operating expense data published by the Building Owners & Managers Association, the Cotton appraisal prepared for SDG & E on October 10, 1965, estimated that the net income before depreciation of the 861 Building would be $43,875 per year. The data in the Cotton report was available to and reviewed by Young before JRYA purchased the 861 Property from the foundation. When JRYA purchased the 861 Property from the foundation, Young was aware of the appraisal of $700,000 for the entire property made by Security Pacific National Bank for loan purposes.

On December 29, 1967, annual net income of $71,800 (not including management costs, debt service, or depreciation) could reasonably have been anticipated from operation of the 861

---

[10] "Gross rental income" includes the value of space occupied by JRYA and other occupants of 861 Building who did not pay cash rents but whose liabilities were accrued as accounts receivable. These unpaid rents were often substantial, totaling $75,950 for the fiscal year ending Sept. 30, 1973, for example.

[11] These expenses do not include management costs or rentals payable to 7th P.A. and 11th P.A.

Building. This figure is based on the following estimates of gross income, vacancies, and expenses:

|  | Monthly | Annual |
|---|---|---|
| Gross rent: | $19,005 | $228,060 |
| (Monthly average | | |
| 27.02¢/sq. ft. × 70,338 sq. ft.) | | |
| Less: | | |
| Allowance for vacancies | 4,751 | 57,015 |
| (25 percent) | | |
| Expenses[12] | | |
| (Monthly average 11.76¢/sq. ft.) | 8,270 | 99,245 |
|  | 5,984 | 71,800 |

An appraisal of the value of the 861 Property on December 29, 1967, was prepared by Whittlesey Associates, real estate appraisers in Pasadena, Calif. The report put the total value of the building, building site, and parking lot land (free and clear of lease) at $700,000. This amount was distributed as follows:

| | |
|---|---|
| Building site | $156,000 |
| Parking lot land | 132,000 |
| Office building | 412,000 |
| Total | 700,000 |

The Whittlesey appraisal also contained two investment analyses. The first estimated before-tax profits for a purchaser of the 861 Building and building site at fair market value, $568,000. The analysis assumed financing of 70 percent of the purchase price over 20 years at 7-percent interest. The calculations showed return as a percentage of net investment for each year in the 20 years remaining in the building's useful life. Whittlesey's analysis indicated a return in the range of 15 to 17 percent for most years, which is sufficient to make the investment economically viable. The analysis appears in the table on page 75.

Whittlesey's second investment analysis was based on the structure of the partnerships' investment in the 861 Building, including purchase price and lease terms. In this analysis

---

[12]Estimated expenses are based upon data published by the Building Owners & Managers Association of national and regional averages in 1967 and 1968 for buildings similar to the 861 Building. These expenses do not include management costs, debt service, or depreciation.

INVESTMENT ANALYSIS OF OWNERSHIP AT FAIR MARKET VALUE

| Year | Col. 1<br>Cash flow | Col. 2<br>Loan principal<br>amortization | Col. 3<br>Depreciation | Col. 4<br>Net dollars<br>for year | Col. 5<br>Net<br>investment | Col. 6<br>Return on net<br>investment (%) |
|---|---|---|---|---|---|---|
| 1 | $35,000 | $9,458 | $20,600 | $23,858 | $159,258 | 14.98 |
| 2 | 33,250 | 10,142 | 20,600 | 22,792 | 148,800 | 15.32 |
| 3 | 31,500 | 10,875 | 20,600 | 21,775 | 139,075 | 15.66 |
| 4 | 29,750 | 11,661 | 20,600 | 20,811 | 130,136 | 15.99 |
| 5 | 28,000 | 12,504 | 20,600 | 19,904 | 122,040 | 16.31 |
| 6 | 26,250 | 13,408 | 20,600 | 19,058 | 114,848 | 16.59 |
| 7 | 24,500 | 14,378 | 20,600 | 18,278 | 108,626 | 16.83 |
| 8 | 22,750 | 15,417 | 20,600 | 17,567 | 103,443 | 16.98 |
| 9 | 21,000 | 16,532 | 20,600 | 16,932 | 99,375 | 17.04 |
| 10 | 19,250 | 17,727 | 20,600 | 16,377 | 96,502 | 16.97 |
| 11 | 17,500 | 19,008 | 20,600 | 15,908 | 94,910 | 16.76 |
| 12 | 15,750 | 20,382 | 20,600 | 15,532 | 94,692 | 16.40 |
| 13 | 14,000 | 21,856 | 20,600 | 15,256 | 95,948 | 15.90 |
| 14 | 12,250 | 23,436 | 20,600 | 15,086 | 98,784 | 15.24 |
| 15 | 10,500 | 25,130 | 20,600 | 15,080 | 103,314 | 14.55 |
| 16 | 8,750 | 26,947 | 20,600 | 15,097 | 109,661 | 13.77 |
| 17 | 7,000 | 28,895 | 20,600 | 15,295 | 117,956 | 12.97 |
| 18 | 5,250 | 30,984 | 20,600 | 15,634 | 128,340 | 12.18 |
| 19 | 3,500 | 33,224 | 20,600 | 16,124 | 140,964 | 11.44 |
| 20 | 1,750 | 35,625 | 20,600 | 16,775 | 155,989 | 10.75 |

Col. 1   Cash flow equals net income ($72,000 in year one, decreasing by $1,750 each year) less annual mortgage payment of $36,991 (rounded to $37,000).

Col. 2   Loan principal amortization is the principal portion of each year's mortgage payment.

Col. 3   Depreciation is a straight 5 percent per year of the $412,000 value of the building.

Col. 4   Net dollars for year equals cash flow plus loan principal amortization less depreciation.

Col. 5   Net investment equals the $170,400 downpayment plus accumulated loan principal amortization less accumulated depreciation. Of course, at the end of 20 years, the building is completely depreciated, and net investment is reduced to the value of the land.

Col. 6   Return on net investment equals net dollars for year divided by net investment.

Whittlesey assumed that for the 10-year lease term, CMC would make the required building lease payments of $180,000 per year[13] and land rents of $12,000 annually. The income calculations for the next 10 years were based on the assumption that the building lease and land sublease would not be renewed and on Whittlesey's projections of declining net income from the partnerships' operation of the building. Whittlesey assumed that the lease of the building site by JRYA to the partnerships would be renewed and that rent under the inflation provision in that lease (based on a compound annual rate of 3 percent) would be $16,128 during the first 5-year renewal period, and $18,696 for the second.

Whittlesey's second investment analysis employed alternative depreciation methods. The first set of calculations was based on straight-line depreciation of $90,000 annually (5 percent of $1,800,000 over 20 years). Because this $90,000 exceeded the principal portion of each year's mortgage payment for the first 11 years, net investment during this period was determined to be a constantly increasing negative amount. After the 11th year, the amount of principal paid annually was to exceed the $90,000 annual depreciation, and net investment was projected to gradually move back toward zero.

A second set of calculations was based on an accelerated-depreciation method. For the first 6 years Whittlesey, assuming a 15-year useful life, used the 150-percent declining balance method (which was employed by the partnerships). Beginning in the seventh year, Whittlesey's calculations used the straight-line method since that method became more advantageous then. The building was assumed to be completely depreciated at the end of 20 years, the end of its economic life. Whittlesey gave no consideration to the value of the land since it was not owned by the partnerships and would probably not be purchased under the option provisions.

Whittlesey's second investment analysis concluded that the limited partnerships' investment lacked economic vitality. It projected no positive cash flow in any year. Net investment and

---

[13]Whittlesey's appraisal of the 861 Property projected only $72,000 annual net earnings from the building. If the assumption that CMC would make the $180,000 payments were to be fulfilled, CMC would have to use funds from some other source to make up the difference of more than $100,000 each year.

net dollars were calculated to be negative amounts in almost every year, whether computed under straight-line or accelerated depreciation. Whittlesey's analysis indicated that petitioners could never receive a return on a pre-tax basis. His calculations appear in the table on pages 78 - 79 .

Until about mid–1960, Jack R. Young had been a life insurance salesman for the Home Life Insurance Co. He then left that company to engage in the sale of business life insurance and life insurance for estate planning. He operated a sole proprietorship, doing business as Jack R. Young & Associates. The majority of his customers were doctors, dentists, and other professional people. Gradually his customers began to come to him for advice and recommendations concerning investment proposals, largely real estate tax-shelter projects. In the first such project in which Young was involved, about 1963, Young worked with another corporation. Between 1963 and 1966, Jack R. Young & Associates was essentially dormant while Young was engaged as a salesman of interests in sale-and-leaseback tax-shelter projects arranged by Wood, Struthers & Winthrop, a New York brokerage firm, and Roderick Cushman.

Following the incorporation of JRYA in May 1966, Young was engaged on his own in the location and acquisition of properties suitable for syndication. Young was in charge of the activities of JRYA and made the decisions in the operation of its business. He was not only president and principal shareholder of JRYA, but also a salesman for the company. In the years 1967 through 1969, he set up between 50 and 55 limited partnership real estate syndications in which JRYA was the general partner. Young received no salary from JRYA; he was paid a commission of 12½ percent of the partnership interests sold by him. Young devoted a large part of his time and effort to selling interests in real estate syndications. He earned commissions of approximately $71,000 in 1967, $149,000 in 1968, and $364,000 in 1969, in addition to life insurance commissions.

Although he was involved extensively in syndicating real estate investments, Young had no training as a real estate broker, and during the years in issue, did not have a real estate salesman's license. He was not registered as an investment adviser with the United States Securities and Exchange Com-

INVESTMENT ANALYSIS OF OWNER-

| | Col. 1 | Col. 2 | Col. 3 | Col. 4 | Col. 5 | Col. 6 | Col. 7 | Col. 8 |
|---|---|---|---|---|---|---|---|---|
| | | | | Purchase | | | | |
| | Building | Land | Total. | contract payments | | Lease | Total | Cash |
| Year | income | income | income | Principal | Interest | payments | payments | flow |
| 1 | $43,200 | $12,000 | $55,200 | $43,200 | $pre-pd | $12,000 | $55,200 | 0 |
| 2 | 111,756 | 12,000 | 123,756 | 50,780 | 60,390 | 12,000 | 123,170 | 0 |
| 3 | 168,000 | 12,000 | 180,000 | 49,765 | 118,234 | 12,000 | 180,000 | 0 |
| 4 | 168,000 | 12,000 | 180,000 | 53,362 | 114,637 | 12,000 | 180,000 | 0 |
| 5 | 168,000 | 12,000 | 180,000 | 57,220 | 110,779 | 12,000 | 180,000 | 0 |
| 6 | 168,000 | 12,000 | 180,000 | 61,356 | 106,643 | 12,000 | 180,000 | 0 |
| 7 | 168,000 | 12,000 | 180,000 | 65,792 | 102,207 | 12,000 | 180,000 | 0 |
| 8 | 168,000 | 12,000 | 180,000 | 70,548 | 97,451 | 12,000 | 180,000 | 0 |
| 9 | 168,000 | 12,000 | 180,000 | 75,640 | 92,351 | 12,000 | 180,000 | 0 |
| 10 | 168,000 | 12,000 | 180,000 | 81,117 | 86,883 | 12,000 | 180,000 | 0 |
| 11 | --- | --- | 54,500 | 86,980 | 81,019 | 16,128 | 184,128 | (129,628) |
| 12 | --- | --- | 52,750 | 93,268 | 74,731 | 16,128 | 184,128 | (131,378) |
| 13 | --- | --- | 51,000 | 100,011 | 67,988 | 16,128 | 184,128 | (133,128) |
| 14 | --- | --- | 49,250 | 107,241 | 60,758 | 16,128 | 184,128 | (134,878) |
| 15 | --- | --- | 47,500 | 114,993 | 53,006 | 16,128 | 184,128 | (136,628) |
| 16 | --- | --- | 45,750 | 123,306 | 44,693 | 18,696 | 186,696 | (140,946) |
| 17 | --- | --- | 44,000 | 132,220 | 35,779 | 18,696 | 186,696 | (142,696) |
| 18 | --- | --- | 42,250 | 141,778 | 26,221 | 18,696 | 186,696 | (144,446) |
| 19 | --- | --- | 40,500 | 152,027 | 15,972 | 18,696 | 186,696 | (146,196) |
| 20 | --- | --- | 38,750 | 144,950 | 4,997 | 18,696 | 186,696 | (147,946) |

Explanation

Col. 1    Building income is rent due under lease to CMC.
Col. 2    Land income is rent due under sublease to CMC.
Col. 3    After expiration of leases, total income is projected net income from partnerships' operation of the building.
Col. 6    Lease payments are amounts payable by partnerships to JRYA under the land lease, including increased rents in renewal periods.
Col. 8    Cash flow equals total income less total payments.

SHIP BY THE LIMITED PARTNERS

| | Using straight-line depreciation | | | Using partnership depreciation method of | | |
|---|---|---|---|---|---|---|
| Col. 9 | Col. 10 | Col. 11 | Col. 12 | Col. 13 | Col. 14 | Col. 15 |
| Loan principal amortization | Depreciation (straight-line) | Net dollars for year | Net investment | Depreciation 150% d.b. & straight-line | Net dollars for year | Net investment |
| $43,200 | $90,000 | ($46,800) | ($46,800) | $180,000 | ($136,800) | ($136,800) |
| 50,780 | 90,000 | (39,220) | (86,020) | 162,000 | (111,220) | (248,020) |
| 49,765 | 90,000 | (40,235) | (126,345) | 145,800 | (96,035) | (344,055) |
| 53,362 | 90,000 | (36,638) | (162,983) | 131,220 | (77,858) | (421,913) |
| 57,220 | 90,000 | (32,780) | (195,763) | 118,098 | (60,878) | (482,791) |
| 61,356 | 90,000 | (28,644) | (224,407) | 106,288 | (44,752) | (527,543) |
| 65,792 | 90,000 | (24,208) | (248,615) | 106,288 | (40,495) | (568,038) |
| 70,548 | 90,000 | (19,452) | (268,067) | 106,288 | (35,740) | (603,778) |
| 75,640 | 90,000 | (14,360) | (282,427) | 106,288 | (30,648) | (634,426) |
| 81,117 | 90,000 | (8,883) | (291,310) | 106,288 | (25,171) | (659,597) |
| 86,980 | 90,000 | (132,648) | (294,330) | 106,288 | (148,936) | (678,905) |
| 93,268 | 90,000 | (128,110) | (291,062) | 106,288 | (144,398) | (691,925) |
| 100,011 | 90,000 | (123,117) | (281,051) | 106,288 | (139,405) | (698,202) |
| 107,241 | 90,900 | (117,637) | (263,810) | 106,288 | (133,925) | (697,249) |
| 114,993 | 90,000 | (111,645) | (238,817) | 106,288 | (127,923) | (688,544) |
| 123,306 | 90,000 | (107,640) | (205,511) | --- | (17,640) | (565,238) |
| 132,220 | 90,000 | (100,476) | (163,291) | --- | (10,476) | (433,018) |
| 141,778 | 90,000 | (92,668) | (111,513) | --- | (2,668) | (291,240) |
| 152,027 | 90,000 | (84,169) | (49,486) | --- | 5,831 | (139,213) |
| 144,950 | 90,000 | (92,996) | (5,464) | --- | (2,996) | 5,737 |

Col. 9     Loan principal amortization is the principal portion of each year's mortgage payment.

Cols. 11, 14     Net dollars for year equals cash flow plus loan principal amortization less depreciation.

Cols. 12, 15     Net investment equals accumulated loan principal amortization less accumulated depreciation.

mission or with any agency of the State of California. Nor did he have prior experience in the management of real estate such as office buildings.

Kenneth Darling was first employed by JRYA in September 1966 when he became its treasurer. In the fiscal year ended September 30, 1968, he was vice president of JRYA, and in the following fiscal year he became president. Darling's duties as president of JRYA were entirely administrative; he was not involved in selling interests in real estate partnerships. He was also generally in charge of the activities of CMC and held the same offices in that corporation that he had in JRYA. Darling handled the leasing of the 861 Building during the taxable years involved here and consulted with Young whenever he had problems with the building. Prior to his employment with JRYA and CMC, Darling had had no experience in the management or leasing of commercial real estate. For approximately 6 or 7 years before he joined JRYA, Darling had been a driver-salesman for a soft drink bottling company and had delivered its products to stores in the San Diego area. In its corporate income tax returns, JRYA reported payment of salary to Darling in the amounts of $24,385 in the fiscal year ended September 30, 1968; $26,500 in fiscal year 1969; and $26,000 in fiscal year 1970.

In the taxable years before the Court, petitioner Kenneth Bowman (Bowman) engaged in the business of selling interests in various real estate syndications, including limited partnerships organized by JRYA. Bowman sold interests in 7th P.A. to at least two petitioners, and 11th P.A. interests to at least four investors. Bowman and his then wife also acquired an interest in 11th P.A. Young sold at least two interests in 7th P.A. The limited partnership interests in 7th P.A. and 11th P.A. were largely sold by Young, Bowman, and an individual named Presnell, each of whom was paid a commission of 12½ percent. Petitioner Robert S. Smith was also a salesman for JRYA. Another petitioner, Leroy A. Miller, was involved in sales for JRYA. Except for Young, all of these salesmen were independent contractors and not employees of JRYA.

JRYA paid sales commissions to Young of $232,600 in the fiscal year ended September 30, 1968; $338,900 in fiscal year 1969; and $262,000 in fiscal year 1970. Commissions paid to Miller, Smith, Bowman, and Presnell were less substantial.

In connection with its sales effort, JRYA had the public

accounting firm of Ernst & Ernst (hereinafter E & E) prepare in December 1967 a forecast of the operation of the 861 Building. Based on information supplied by Young, the forecast contained a series of tax projections for individual participants in the ownership of the building. However, in making these projections, E & E did not have access to copies of the partnership agreements or other documents. The forecast pointed out that the building site rent was subject to increase at each renewal date according to an escalator clause in the building site lease. The E & E forecast also concluded a depreciable life of 15 years for the 861 Building was reasonable in view of the age of the building and the major renovation likely to be required to keep it in service beyond 15 years. E & E projected the losses, income tax savings, and increases in disposable income by limited partners in various income brackets. The forecast indicated that losses would be realized for the years 1967 through 1976.

In selling interests in 7th P.A. and 11th P.A. to petitioners Narver, Leonard, M. E. Powers, R. E. Powers, Gold, and Moore, Bowman had available the E & E forecast and discussed with these petitioners the tax benefits to be realized from their investment. JRYA supplied Bowman with additional schedules which showed the effect on disposable income of tax savings resulting from an investment in 7th P.A. or 11th P.A. Based on the E & E forecast, Bowman also developed various schedules of his own which he used in discussions with prospective purchasers of interests in these partnerships. These schedules, arranged to show tax deductions, writeoffs, and tax savings, pointed out that an investor would recoup through tax savings 100 percent of his investment outlay in a very short period. Bowman also prepared several memoranda explaining the tax benefits of an investment in 11th P.A. These memoranda pointed out, inter alia, that:

(a) None of a "client's" money would go into equity and that all would be applied so as to be tax deductible;

(b) What was being offered was "a pure tax shelter";

(c) If the property failed to produce sufficient income, the worst that could happen was that the lender or seller would foreclose on the property; and

(d) The tax savings realized would give an investor an effective return of 20 percent of his money.

In his letter of March 12, 1968, to petitioner Gold, Bowman

pointed out that an investor in the 861 Building would receive $1.76 in tax writeoffs in 1968 for every dollar invested. He also pointed out that the age of the building was its greatest asset for tax shelter purposes.

Most of the petitioner-husbands were medical doctors at the time they acquired their interests in 7th P.A. or 11th P.A. Few, if any, of the petitioners inspected the 861 Property before investing in one or the other of the partnerships. Many knew little or nothing about the building and its acquisition by JRYA other than the information in the E & E forecast. However, most petitioners consulted no real estate or investment expert before making their investments. Although the petitioners received copies of the annual partnership returns, none received annual reports from JRYA. Moreover, few made any inquiry into the operation of the building. Several petitioners had interests in other partnerships arranged by JRYA and claimed losses from those investments.

In its partnership returns for the taxable years 1968 through 1970, 7th P.A. reported that the 861 Building had a life of 15 years and claimed 150-percent declining balance depreciation with respect to its one-third interest in the building. The following income, deductions, and losses were reported by 7th P.A. on its partnership returns for 1967 through 1972:

| Year | Income | Interest paid | Depreciation claimed | Land rental paid | Loss reported |
|---|---|---|---|---|---|
| 1967 | 0 | $60,000 | 0 | 0 | $60,000 |
| 1968 | $18,400 | 0 | $60,000 | $4,000 | 45,600 |
| 1969 | 41,250 | 21,650 | 54,000 | 4,000 | 38,400 |
| 1970 | 60,000 | 39,373 | 48,600 | 4,000 | 31,973 |
| 1971 | 60,000 | 38,172 | 43,750 | 4,000 | 25,922 |
| 1972 | 60,000 | 36,882 | 39,350 | 4,000 | 20,232 |

In its 1967 partnership return, 7th P.A. reported that the beginning capital account of each of its limited partners had been wiped out by his allocable share of the 1967 loss claimed by 7th P.A. As a result, the return indicated a yearend capital account of zero for each limited partner. In each of the years 1968 through 1972, 7th P.A. reported further losses, and the capital account of each of the limited partners was reduced well below zero. For example, petitioner David Narver's original capital account of $6,000 stood at minus $16,212 at the end of

1972. Each limited partner's share of the total losses of 7th P.A. for the 3 taxable years 1967, 1968, and 1969, amounted to 2.4 times his original investment in the partnership.

In its partnership returns of income for the taxable years 1968 through 1970, 11th P.A. reported that on January 15, 1968, the 861 Building had a remaining life of 15 years and claimed 150-percent declining balance depreciation with respect to its two-thirds interest in the building. The following income, deductions, and losses were reported by 11th P.A. on its partnership returns for 1968 through 1972:

| Year | Income | Interest paid | Depreciation claimed | Land rental paid | Loss reported |
|------|--------|---------------|----------------------|------------------|---------------|
| 1968 | $36,800 | $120,000 | $120,000 | $8,000 | $211,200 |
| 1969 | 82,500 | 43,300 | 108,000 | 8,000 | 76,800 |
| 1970 | 120,000 | 78,747 | 97,200 | 8,000 | 63,947 |
| 1971 | 120,000 | 76,343 | 87,480 | 8,000 | 51,823 |
| 1972 | 120,000 | 73,765 | 78,732 | 8,000 | 40,497 |

In its 1968 partnership return, 11th P.A. reported that the beginning capital account of each of its limited partners had been wiped out by his allocable share of the 1968 loss claimed by 11th P.A. As a result, the return indicated a yearend capital account of zero for each limited partner. In its returns for 1968 through 1972, 11th P.A. reported loss allocations which reduced the capital account of each of the limited partners well below zero. Each limited partner's share of the total losses of 11th P.A. for the 3 taxable years 1968, 1969, and 1970 amounted to almost 3 times his original investment in the partnership.

Under the terms of the 7th P.A. and 11th P.A. limited partnership agreements JRYA, as general partner, was required to keep full books of account for the partnerships and to prepare and transmit an annual report (in addition to the partnership return) to the limited partners. However, JRYA did not supply the required annual reports to any of the limited partners of 7th P.A. and 11th P.A. Nor were books of account set up or maintained by JRYA during the years 1967 through 1969 for 7th P.A., and 1968 and 1969 for 11th P.A. Journal and ledger records for the limited partnerships were not initiated until 1970.

JRYA, CMC, 7th P.A., and 11th P.A. all used the cash basis method of accounting in their books and records and on their tax returns. The only cash actually received or disbursed by 7th P.A.

in the years 1967, 1968, 1969, and 1970 were the limited partners' capital contributions and prepaid interest of $60,000 paid to JRYA as seller of the 861 Building. Similarly, in 1968, 1969, and 1970, no cash amounts were actually received or disbursed by 11th P.A. except for the limited partners' capital contributions of $120,000 and the $120,000 interest paid to JRYA. The books and records of 7th P.A. and 11th P.A., which were first prepared in 1970, are in error to the extent they reflect any additional receipt or disbursement of cash. JRYA made no cash or check payments to CMC in the years 1967 through 1970 as rent for the space in the 861 Building occupied by JRYA. Nor did CMC make any cash or check payment to 7th P.A. and 11th P.A. in those years for the lease of the building or sublease of the land. Seventh P.A. and 11th P.A. made no payments to JRYA in 1967, 1968, 1969, or 1970 under the agreement of purchase, as amended, other than the initial $180,000 prepaid interest. With these four exceptions, the entries in the books and records of JRYA, CMC, 7th P.A., and 11th P.A. which purport to record payment and receipt of rentals, interest, and other amounts among these various entities are mere bookkeeping entries and do not reflect amounts in fact paid or received.

In October 1973, JRYA (then known as Young Properties Corp. (YPC)) and CMC instituted proceedings under chapter XI of the Bankruptcy Act in the United States District Court for the Southern District of California (hereinafter the District Court). JRYA and CMC were authorized to remain in possession of their respective properties and to operate their businesses. Wilford D. Willis, who had been counsel to JRYA and was elected president of YPC, was designated by the District Court as the responsible officer of YPC and CMC. Acting as YPC's president, Willis made extensive efforts over a long period of time to sell the 861 Property, including the building, building site, and parking lot land. However, it was Sutherland, president of Sutherland Foundation, who found a buyer, Universal Financing. Sutherland also agreed that the foundation would increase its loan to $600,000 and would extend the repayment period to 30 years at 6½-percent interest with no acceleration clause. On August 6, 1974, YPC filed an application with the District Court requesting authority to accept an offer for purchase and to sell the 861 Property. In the application, Willis and counsel for YPC summarized the efforts which had been

made to sell the 861 Property, and 7th P.A. and 11th P.A. indicated their approval of the offer set forth in the application. The application stated that at that time the unpaid principal balance on the first trust deed note held by the foundation was $514,520 and that there were delinquent taxes, penalties, and interest owed of $21,138. The application also stated that during the course of the chapter XI proceeding, the income from the 861 Building had been sufficient only to pay operating expenses and interest on the note to the foundation. The application further indicated that 7th P.A. and 11th P.A. had not made any installment payments to YPC under the sales agreement and were in default in their obligations. After a hearing on January 6, 1975, the District Court, acting through a bankruptcy judge, authorized the sale of the 861 Property for $700,000. The District Court ordered that in full satisfaction of the claims and interests of 7th P.A. and 11th P.A., the limited partnerships, together, would receive $5,000 of the net cash proceeds of the sale and a one-half interest in a $100,000 promissory note. CMC, 7th P.A., and 11th P.A. quitclaimed their respective interests in the 861 Property to YPC, and YPC conveyed the property to the new owner by deed dated January 17, 1975.

Respondent, in his statutory notices to petitioners herein, disallowed all deductions for losses of 7th P.A. and 11th P.A. claimed by the limited partners, because, in the words of the notice to petitioners David L. Narver and Margaret B. Narver[14] —

you have not established that said alleged partnership qualifies as either a partnership or limited partnership for purposes of federal income taxation and/or that said alleged partnership, or any transaction in which said entity was involved, had any business purpose or economic reality aside from the avoidance of taxes.

In his opening brief in this case, respondent argues four grounds for disallowing the deduction. First, he contends that 7th P.A. and 11th P.A. were not validly indebted to JRYA for the purchase of the 861 Building and that, therefore, the transaction cannot support either interest or depreciation deduc-

---

[14]Similar language was employed in the statutory notices to the other petitioners.

tions. Respondent also argues that 7th P.A. and 11th P.A. did not acquire the benefits and burdens of ownership of the 861 Building. Third, it is respondent's contention that the partnerships entered into the transaction without any business purpose and without a profit motive. Finally, respondent characterizes the sale and leases involved in this case as sham transactions without economic substance.[15]

Petitioners, on the other hand, argue that the transactions at issue constituted a bona fide sale-leaseback both in substance and in form. They further contend that the purchase price of the 861 Building was reasonably related to its fair market value and that they had a possibility of economic return from the transactions apart from tax benefits. Finally, it is petitioners' contention that they did not enter into the transactions for a tax-avoidance purpose.

## ULTIMATE FINDING OF FACT

The fair market value of the 861 Building on December 29, 1967, did not exceed $412,000.

## OPINION

The principal issue in this case is whether petitioners are entitled to deduct their distributive shares of asserted partnership losses which arose from the excess of claimed depreciation and interest expense over rental income from the 861 Building. The facts which led to the partnerships' reported depreciation and interest deductions are complicated.

The 861 Building, constructed in 1910, was acquired in 1923 by San Diego Gas & Electric (SDG & E) for use as its corporate headquarters. SDG & E occupied the building for many years and in the 1960's decided to build new headquarters and sell the 861 Building. After having the building and the underlying and adjacent real property appraised at a value of $555,000 ($145,000 of which was allocable to the building itself), SDG & E sold the entire property to the Sutherland Foundation (foundation) for $700,000 on July 1, 1966. At the same time, the foundation leased

---

[15]In his brief with respect to the report of the Special Trial Judge, respondent raises another issue, contending that 7th P.A. and 11th P.A. are associations taxable as corporations. In light of our disposition of this case on other grounds, we do not reach this issue.

the property back to SDG & E for a minimum term of 27 months (until September 30, 1968). The lease was a net lease; the monthly payments of $15,645 equaled the foundation's mortgage payments, and SDG & E paid all utilities, taxes, and maintenance expenses. Sutherland, the foundation president, did not expect to be able to rent the property for $15,645 a month after SDG & E vacated and would not have purchased the property without the leaseback.

As the end of the 27-month SDG & E lease term approached, Sutherland contacted many potential purchasers in an attempt to sell the property for $700,000. After 7 months without success, Sutherland reduced the price to $650,000. On December 29, 1967, the foundation sold the property to Jack R. Young & Associates, Inc. (JRYA), at the reduced price.

JRYA executed an interest bearing note to the foundation for the entire $650,000 purchase price. The note was secured by a deed of trust. The foundation assigned to JRYA all of its interest in the SDG & E lease. JRYA assigned back to the foundation the remaining rents for the minimum term of the SDG & E lease, $140,805, in part payment of principal and interest.

JRYA then sold the 861 Building (but not the underlying and adjacent land) to 7th P.A. and 11th P.A. for $1,800,000, plus $180,000 prepaid interest. The record contains two conflicting documents of sale.[16] The first, drafted in late 1967 and dated December 30, 1967, was entitled "Sales Agreement." It provided for payments of the purchase price, plus 7-percent interest, over a period of 20 years. Under the sales agreement JRYA, as seller, was to remain responsible for taxes and maintenance expenses; the partnerships had no responsibility for costs in connection with their ownership of the building.

The other agreement, the "Agreement of Purchase," was

---

[16]The record in this case is made confusing by the duplication of documents governing the sale and leaseback of the 861 Building and the lease of the underlying land to the partnerships. The documents bore dates of execution and jurats which are admittedly untrue. Petitioners contend that the second versions of the sale and leaseback instruments (the agreement of purchase and the master lease) were the operative instruments. On the other hand, they contend that the first version of the land lease, not the fully executed second version (drafted at about the same time as the agreement of purchase and the master lease), controlled the relationship between the parties with respect to the land. We need not resolve these questions, however, since our determination of the issues in this case does not depend on which document of each pair is legally operative.

drafted in late 1968, although it was dated December 29, 1967. Darling, who executed the agreement of purchase on behalf of all parties, intended that it supersede the sales agreement, even though it did not expressly so provide and even though the sales agreement was dated 1 day later. Under the agreement of purchase, the partnerships were required to pay taxes and other assessments and to keep the building and its contents insured for $1,800,000. The agreement did not require JRYA as seller to be responsible for maintenance costs and other expenses. At some point in 1970, the schedule of purchase payments contained in the agreement of purchase was discovered to be incorrect. At that time, an amendment to the agreement, "as of December 29, 1967," was entered into to properly reflect amortization of the purchase price, plus 7-percent interest, over 20 years. Under the amended agreement of purchase, the partnerships were to pay $180,000 prepaid interest, $3,600 per month for 17 months, $9,756 in the 18th month, then $14,000 monthly through the end of the contract.

Both the sales agreement and the agreement of purchase conveyed a one-third interest in the 861 Building to 7th P.A., and a two-thirds interest to 11th P.A. The partnerships' obligation to JRYA under both agreements was nonrecourse. The limited partners' capital contributions of $60,000 in 7th P.A. and $120,000 in 11th P.A. were credited by JRYA as prepaid interest. Neither version of the agreement indicated that JRYA had assigned the rents payable under the SDG & E lease to the foundation.

JRYA did not sell the land underlying the 861 Building to the partnerships but leased it to them for 10 years, with options to renew, for $1,000 per month. The rent during the renewal period was to be $1,000 plus a cost-of-living adjustment, and 7th P.A. and 11th P.A. were to pay all taxes on the property. JRYA also gave the partnerships an option to purchase the land.

Again, the record contains two lease documents which differed only in their purchase option provisions. The first, dated December 29, 1967, required the payment of all rents, taxes, and other obligations through November 29, 1977, and the payment of the full purchase price of the 861 Building before the purchase option could be exercised. The option price was $200,000, and notice of the partnerships' intent to exercise the option was required before November 30, 1977.

Another "Land Lease" bearing the same date was executed by Darling on behalf of all parties. This document was drafted in 1968, at about the same time as the agreement of purchase. Under this version of the lease, notice of intent to exercise the option was to be given by November 1, 1977, and all payments were to be made by the close of escrow before January 3, 1978. The option price was to be set by a panel of three appraisers, but with a minimum price of $200,000.

The partnerships leased the building in turn to CMC, a wholly owned subsidiary of JRYA, for a 10-year term ending December 1977. There are two versions of this lease in the record. Under the first, dated December 29, 1967, CMC agreed to pay rent according to a schedule identical to the partnerships' schedule of installment payments to JRYA under the unamended agreement of purchase. CMC also agreed to pay all utilities, taxes, insurance premiums, and repair costs.

The other version of the lease to CMC, the "Master Lease," was also dated December 29, 1967, and was drafted in late 1968. Under the Master Lease, which was executed by Darling on behalf of all parties, CMC was required to pay as rent all amounts which the partnerships were to pay JRYA under the agreement of purchase, including installment payments, taxes, and insurance premiums. A copy of the agreement of purchase was attached to the master lease.

The building site was subleased by 7th P.A. and 11th P.A. to CMC under a separate "Sublease of Ground Lease" dated December 29, 1967. The sublease was for a term of 10 years and did not include assignment of the options to renew or purchase. CMC agreed to pay as rent the amount required of the partnerships under their land lease with JRYA.

The SDG & E lease was terminated by SDG & E before the 27-month minimum term was up. In consideration for this early termination, SDG & E paid the foundation $41,430. Young consented to this cancellation and payment and also agreed to an assignment of $21,150 of future rents from other tenants to the foundation. Seventh P.A. and 11th P.A. were not parties to this consent or assignment, nor were the limited partners informed of Young's actions. The assignments were for the benefit of JRYA and did not reduce the partnerships' indebtedness to JRYA.

The fair market value of the 861 Building on December 29, 1967, is a key factor in our legal analysis in this case. Our finding of fact that the value of the building on that date did not exceed $412,000 is based on analysis of the history of the property and of the testimony and appraisals of four witnesses.

The record shows that the 861 Building, its underlying site, and the adjacent parking lot land were sold twice within a period of 18 months prior to the sale of the building to the partnerships. In July 1966, the 861 Property was sold to the Sutherland Foundation for $700,000; on December 29, 1967, JRYA bought it for $650,000. The 861 Property was also sold with the approval of the bankruptcy court judge in January 1975 for $700,000. All these sales were arm's-length transactions.

However, JRYA sold the 861 Building to 7th P.A. and 11th P.A. for $1,800,000 on December 29, 1967, the date JRYA had acquired the building and the rest of the property for $650,000. (In this transaction, JRYA acted as purchaser on behalf of the partnerships and as seller.) Such a resale of a part of the property at nearly 3 times the purchase price of the entire property makes the bona fides of the transaction suspect on its face. *Thompson v. Commissioner*, 66 T.C. 1024, 1051 (1976).

In the period between October 10, 1965, and June 27, 1966, the 861 Property was appraised by John Cotton, an independent expert real estate appraiser, and by R. H. Rodgers, who was then vice president in charge of the appraisal department of the Security First National Bank. Cotton, acknowledged by petitioner to possess expert qualifications, appraised the value of the 861 Property as of October 10, 1965, to be $555,000, of which $145,000 was allocated to the 861 Building. In arriving at these values, Cotton used three recognized approaches to determining value— cost, market data, and income capitalization.[17] He analyzed area

---

[17]The income capitalization approach to valuation is based on the theory that the value of a property depends on its income producing power. In simplest terms, under this approach, value is equal to net operating income divided by a capitalization rate. (Of course the lower the rate of capitalization is, the higher the value of the property.) The capitalization rate is influenced by many factors. Although it is related to the rate of interest in a basic way, it also includes risk and liquidity factors and a recapture of capital component. *Ambassador Apartments, Inc. v. Commissioner*, 50 T.C. 236, 243 (1968), affd. 406 F.2d 288 (2d Cir. 1969); see Encyclopedia of Real Estate Appraising 39–49 (3d ed. E. Friedman 1978); E. Smith, "Issues and Problems in Valuation of Real Estate," 30th Ann. N.Y.U. Inst. on Fed. Tax. 209, 231–235 (1971).

and neighborhood data and the property itself—its history, condition, use, and use potential. In addition to his qualifications as an expert appraiser, Cotton possessed extensive experience as a real estate property manager and counselor.

Robert H. Rodgers, now assistant vice president and chief appraiser for the San Diego division of the Security Pacific National Bank (formerly Security First National Bank), appraised the 861 Property in connection with the Sutherland Foundation's application for a mortgage loan in the amount of $466,000 in June of 1966. He determined the value of the property to be $700,000, of which $240,000 was allocated to the building. Rodgers had long experience in appraising real estate in connection with loan applications. He and his assistant were familiar with the 861 Building and with San Diego real estate in general. They examined the building and the surrounding area and determined rental values based on single or multiple tenant occupancy. In reaching their valuation, the bank appraisers placed major emphasis on the value of the lease between the foundation and SDG & E. They noted that the lessee had unquestioned ability to pay the required rent and insisted that the lease be in effect on the date the loan was made. The SDG & E lease called for a monthly rent of $15,645, an amount sufficient to amortize a 6½-percent loan of $394,223.14 over the lease's 27-month minimum term. Rodger's report cautioned that any change in the lease provisions stated in the report would substantially lower the value of the property and require a revaluation.

Sometime in late 1971 or early 1972 Stephen Whittlesey, an independent expert real estate appraiser, began an investigation of the 861 Property at respondent's request. He examined the date and nature of the building's construction; its improvements, maintenance, and condition; the building's location and the future of the building and its neighborhood; the use and future maintenance requirements of the building; and sales of comparable land and buildings. In 1972, Whittlesey prepared an appraisal of the fair market value of the property on December 29, 1967, based on market data and income capitalization.[18] Prior to trial, at the request of respondent, Whittlesey revised his

---

[18]Whittlesey did not use the cost or summation approach because of the difficulty of accurately measuring depreciation in the case of very old buildings such as the 861 Building.

report to eliminate use of certain data from after the valuation date and to add additional information and explanatory footnotes for clarification. He also deleted a computer investment analysis, which counsel for respondent believed to be too hard to understand, and substituted a simplified investment analysis. The conclusions of his revised report were based on market information available at the valuation date. Whittlesey, in his revised report dated October 2, 1976, determined that the fair market value of the 861 Property as leased on December 29, 1967, was $725,000, and that the value, clear of the lease, was $700,000, of which $412,000 was attributed to the building.

Petitioners did not try to establish fair market value by the testimony of an independent appraiser. Instead, they offered the testimony of Jack R. Young, as an officer of JRYA, to support their contentions that the fair market value of the building on December 29, 1967, was $1,800,000. Young used a capitalization of income approach to reach this value.

Young lacked the qualifications of the other appraisers who testified, and his real estate experience was limited by comparison. Before he became involved in syndicating properties for investment and selling interests in tax-shelter projects, Young had sold life insurance. In about 1963, he engaged in his first real estate project when, as he testified, "we had arranged for several of our doctors to buy five different apartment projects in Orange County and the Los Angeles area." The record does not indicate exactly what role Young played in that transaction. In 1966, CMC was organized to manage the apartment projects. Young was not involved in the day-to-day operations of CMC. He testified that he also participated in the purchase of other real estate, but his testimony did not establish the precise nature of his participation in those projects. He did not have any training as a real estate broker and did not possess a real estate salesman's license. In light of all of these factors, we conclude that Young's judgment with respect to valuation of real estate in general is entitled to less weight than that of the three expert appraisers.

We also conclude that Young's opinion as to the value of the

---

Cf. *Ambassador Apartments, Inc. v. Commissioner*, 50 T.C. 236, 242 n. 6 (1968), affd. 406 F.2d 288 (2d Cir. 1969).

861 Building in particular should be accorded far less weight. Young's obvious interest in assigning a high value to the building reduces the persuasiveness of his testimony. Moreover, after carefully examining his testimony, we find that it is based on vague generalities, erroneous assumptions, and unsupported projections. For example, Young assumed the building had 75,000 square feet of available rental space. From examination of the plans and the building itself and from actual measurements, Whittlesey determined the rentable area was 70,338 square feet. We are not persuaded in the least as to the accuracy of Young's figures for monthly rent per square foot, vacancy rate, operating expenses, and capitalization rate.

Young's calculation for the value of the building was based on an average monthly rent of at least 30 cents per square foot for all space in the building, or $270,000 annually for the entire building. Cotton estimated various rents for different floors ranging from 12 cents to 30 cents, and averaging 22 cents a square foot. Whittlesey estimated various rental rates averaging 27 cents per square foot. Young testified that he and Bert Fisher[19] felt that 30 cents monthly per square foot was "a very good rental rate." Young's knowledge of rental rates for commercial office space grew out of his alleged search for office space. His testimony in this regard is not at all convincing.

Young mentioned eight buildings concerning which he made inquiries. Of the eight, only two were from the same pre–1920 era as the 861 Building—the Spreckels Theatre Building and the Robinson Building. Young testified as to the monthly rent of only one building, the Fox Building, which he said ranged between 30 and 40 cents per square foot. However, the Fox Building had been completely remodeled in 1963 and was classified by other experts as much newer than the 861 Building. Whittlesey reported that the monthly rental rate for the Robinson Building in 1967 was 25 cents per square foot for space without air-conditioning, and 40 cents for two ground floor tenants. Although Whittlesey did not consider the Spreckels

---

[19]Fisher had helped arrange the sale of the 861 Property by the foundation to JRYA, for which Sutherland had agreed to pay him $34,000. The qualifications of Fisher, who was deceased at the time of trial, as an expert in the valuation of commercial real estate such as multitenant commercial office buildings have not been established. The record does establish that Fisher had strong financial incentives to convince Young that JRYA was making a bargain purchase.

Theatre Building, Cotton reported that its monthly rent in October 1965 was 26 to 28 cents per square foot.

Another source of information used by Young was a document dated October 30, 1964, which showed San Diego office buildings and their rents. Rents for space in older buildings on the schedule ranged from 15.4 cents to 33 cents, and averaged 26.3 cents per square foot. Referring to this schedule of 1964 rents, petitioners urge that Young could reasonably have anticipated a monthly rental of 30 cents per square foot in 1967, even though they have not demonstrated that these buildings were comparable to the 861 Building. At the same time, petitioners discount Cotton's potential monthly rent figure of 22 cents per square foot for the 861 Building on October 10, 1965, because it did not purport to relate to the value of the building on December 29, 1967.

While we might agree with the feelings of Young and Fisher that 30 cents per square foot was very good rental rate for the 861 Building, there is no persuasive evidence to show that that rate could be obtained in 1967 for a pre–1920 era building, except on the ground floor. Young's figure was a potential rent which could be obtained "by fixing that property up and renting it out." However only the ground and eighth floors had been remodeled when the partnerships bought the building, and the eighth floor was occupied by JRYA. We conclude, therefore, that there was no reasonable basis for Young and Fisher to assume that an annual gross rent of $270,000 was obtainable from the rental of the 861 Building with multiple tenant occupancy.

Young's valuation of the building assumed 100-percent occupancy. The evidence in this case indicates that a substantial vacancy rate existed in the latter part of 1967. Cotton used a vacancy rate of 15 percent based on his survey of comparable buildings, and Whittlesey found that the vacancy rate at the date of his valuation was 25 percent. Young, however, did not investigate the vacancy rate in comparable or superior commercial office buildings when he computed the expected rental income from the 861 Building. Young's failure to take into account a substantial vacancy rate weakens further the persuasiveness of his valuation.

Young assumed that the operating expenses of the 861 Building were $90,000 annually during the SDG & E tenancy and that the figure would remain the same when the building

was operated as a multitenant commercial property. Cotton estimated the total expense from multitenant operation of the building to be $123,125; Whittlesey's estimate was $99,245. Young determined his figure by subtracting SDG & E's total annual rent ($187,740, rounded to $180,000) from his expected gross annual rent of $270,000. However, we do not believe this figure necessarily represented the expenses incurred by SDG & E in operating the building. Moreover, even if it did, it cannot be assumed that multitenant operation of the building would result in the same operating costs. Cotton, who in addition to his other qualifications, had extensive experience in and knowledge of management of commercial office buildings in downtown San Diego, made studies and comparisons of expense data and information collected annually by the Building Owners & Managers Association before setting his $123,125 figure. After analysis of the BOMA figures for 1967–68, Whittlesey estimated operating expenses would be $99,245. Whittlesey took into account the low occupancy level which he foresaw for the building and the actual taxes on the building, which were lower than average. The small disparity between Whittlesey's figure and Young's estimate should be considered in light of the differences in occupancy level envisioned by each.

To determine the present value of the 861 Building from an income standpoint, Young capitalized his estimate of net operating income ($168,000) at the rate of 9.33 percent. This rate was based solely on his estimate that the market interest rate in November 1967 for a 20-year loan on the building was 7 percent.[20] However, for both Cotton and Whittlesey, the interest rate was only a part of their rate of capitalization. After examination of market data, Cotton determined that the capitalization rate (for October 1965) should be 14 percent. Whittlesey arrived at an overall rate of 12.5 percent. Both rates were composites of (1) the rate of interest and (2) the rate of amortization or depreciation, abstracted from current market rates.

Petitioners claim that a value of $1,800,000 is consistent with the range of reasonable variation in the specific factors which the expert witnesses considered in their valuations. Petitioners'

---

. [20]In November 1967, average yields on newly issued Aa corporate bonds were 6.72 percent. 1 Moody's Industrial Manual a46 (1975 ed.).

counsel selected amounts from the ranges of figures found by the experts for other buildings so that, when plugged into the computation, they resulted in a value substantially equal to the sales price. Young's mathematical calculation is merely an exercise in arithmetic; it completely disregards the judgment that these experienced experts in real estate employed in selecting figures appropriate for the 861 Building. The excessiveness of petitioners' amounts are exaggerated several fold when multiplied by the other extreme figures in their computation. We are not persuaded by petitioners' selective variable method of computation.

Petitioner would have us believe that a building which JRYA purchased on December 29, 1967, in an arm's-length transaction for $250,000 (if we accept their valuations of the building site and parking lot land at $200,000 each) was, in fact, worth $1,800,000. In *Ambassador Apartments, Inc. v. Commissioner*, 50 T.C. 236, 243 (1968), affd. 406 F.2d 288 (2d Cir. 1969), we characterized as "dramatic" a 26-percent increase in the value of an apartment building and land over the period of a year. Surely, an increase in value of more than 600 percent in a single day "strains reasonable credulity." *Thompson v. Commissioner*, 66 T.C. 1024, 1051 (1976).

The sale of the building by JRYA to the partnerships gives no indication of fair market value. Fair market value has been defined as the price at which a willing buyer will purchase a property from a willing seller, when neither party is acting under compulsion and both parties are fully informed of all the relevant facts. *McShain v. Commissioner*, 71 T.C. 998 (1979). This definition assumes that the buyer and the seller will not be the same individual or entity and will have adverse economic interests. *Campana Corp. v. Harrison*, 114 F.2d 400 (7th Cir. 1940). However, in this transaction, JRYA was both seller and buyer. Under such circumstances, it would be difficult to conclude that the sale was at arm's length. Nor were petitioners, as investors in the limited partnerships, fully informed of all the relevant facts. Despite Young's explanation to the contrary, we believe that the additional tax stamps were affixed to the deed from the foundation to JRYA to prevent petitioners from learning the price paid by JRYA for the property. Moreover, petitioners did not know of the assignment of rents by JRYA.

The two prior sales of the 861 Property give a far better

indication of the fair market value of the building. When two parties dealing at arm's length assign a certain value to property being sold, and when that value has economic significance to each of the parties, the value assigned by the parties is very persuasive evidence of its fair market value. *Elmhurst Cemetery v. Commissioner*, 300 U.S. 37, 39 (1937); *Ambassador Apartments, Inc. v. Commissioner, supra*. This evidence will be determinative of the actual fair market value in the absence of competent evidence to overcome it.

In this case, we do not believe that the contemporaneous arm's-length sale between the foundation and JRYA can be ignored. The $650,000 price for the 861 Property is more reliable evidence of its fair market value than the use of a mathematical formula in which a wide variety of figures can be used to determine rent payments, interest rates, monthly amortization, and net income. Moreover, a value in this range is supported by the price of the prior sale by SDG & E to the foundation and by the valuation of the qualified expert real estate appraisers, Cotton and Whittlesey. Even if Young actually believed that the property was worth more than he paid for it, his opinion was based more on hope than on solid knowledge.

Petitioners contend that the sale by the foundation to JRYA was a forced sale because Sutherland became "panicky" when he was not able to sell the property in several months. See *Troxel Manufacturing Co. v. Commissioner*, 1 B.T.A. 653, 655 (1925). However, Sutherland had had extensive experience in real estate matters in his long banking career. We believe his failure to find a buyer impelled him to reduce his asking price, but not so much that it was substantially less than what he considered to be the property's fair market value. It is incredible to us that Sutherland, an officer of a charitable trust, who had such familiarity with San Diego real estate, would become "a little panicky" and forget his fiduciary duty to the trust or would fail to recognize that he was selling property at far less than one-third its value, if Young's figure of $1,800,000 were accepted.

Finally, petitioners contend that the right to receive the $168,000-per-year net rent under the master lease was an extremely valuable right which supports the reasonableness of the purchase price. However, we do not believe CMC could expect to receive sufficient rental income to pay the net rent to the partnerships, since we have found, as a fact, that a net

income of only $71,800 (before managment costs, debt service, and depreciation) could reasonably have been anticipated from operation of the 861 Building. Nor have petitioners established that CMC was financially able to make up the difference between its net rental receipts and the rent due under its lease with the partnerships. CMC had initial capital of only $10,000. It was organized in December 1966; its sole shareholder (JRYA) was organized in May 1966. CMC's management was unproven and inexperienced in real estate, especially in multitenant commercial office building operations. Clearly, the strength of CMC as lessee bears no comparison with that of SDG & E.

For the foregoing reasons we conclude that the weight of the evidence shows that the fair market value of the 861 Building on December 29, 1967, did not exceed $412,000.

The issue in this case is whether 7th P.A. and 11th P.A. acquired an interest in the 861 Building sufficient to allow them to take interest and depreciation deductions. This is essentially a question of substance versus form. As the Supreme Court stated in *Helvering v. Lazarus & Co.*, 308 U.S. 252, 255, (1939), "In the field of taxation, administrators of the laws, and the courts, are concerned with substance and realities, and formal written documents are not rigidly binding." To be deductible, interest must be paid on genuine indebtedness. *Knetsch v. United States*, 364 U.S. 361 (1960). Similarly, depreciation is not predicated on legal title but on an actual investment in property. *Mayerson v. Commissioner*, 47 T.C. 340, 350 (1966). We conclude that because the purchase price of $1,800,000 was so far in excess of the fair market value of the 861 Building, petitioners had neither a genuine indebtedness to JRYA nor any actual investment in the building. Petitioners are therefore not entitled to the deductions they seek. *Estate of Franklin v. Commissioner*, 544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975); *Beck v. Commissioner*, 74 T.C. 1534 (1980). See also *Hilton v. Commissioner*, 74 T.C. 305 (1980).

*Estate of Franklin* involved the deductibility of interest and depreciation payments claimed with respect to an Arizona motel purchased by a limited partnership. Under the terms of a sales agreement, the seller had agreed to sell the property to the partnership for $1,224,000. This nonrecourse obligation was to be satisfied over a period of 10 years by immediate payment of $75,000 prepaid interest, by principal and interest payments

totaling roughly $9,000 per month, and by a balloon payment of the remaining purchase price (predicted to be $975,000) at the end of 10 years. The sale was combined with a net lease of the property back to the sellers for approximately $9,000 per month. Except for the $75,000 prepayment, no cash was to cross between the sellers and the partnership until the balloon payment. The sellers remained responsible for all of the typical expenses of owning the motel, including all utility costs, taxes, assessments, rents, charges, and levies of "every name, nature and kind whatsoever."

The Court of Appeals stated that the characteristics described above could exist in a situation where the sale would impose on the purchaser a genuine indebtedness which would support both interest and depreciation deductions. However, the taxpayers in *Estate of Franklin* failed to prove that the purchase price was at least approximately equivalent to the fair market value of the property. This defect in the taxpayers' proof was fatal. The court stated (544 F.2d at 1048–1049):

An acquisition such as that of [taxpayers] if at a price approximately equal to the fair market value of the property under ordinary circumstances would rather quickly yield an equity in the property which the purchaser could not prudently abandon. This is the stuff of substance. It meshes with the form of the transaction and constitutes a sale.

No such meshing occurs when the purchase price exceeds a demonstrably reasonable estimate of the fair market value. Payments on the principal of the purchase price yield no equity so long as the unpaid balance of the purchase price exceeds the then existing fair market value. Under these circumstances the purchaser by abandoning the transaction can lose no more than a mere chance to acquire an equity in the future should the value of the acquired property increase. While this chance undoubtedly influenced the Tax Court's determination that the transaction before us constitutes an option, we need only point out that its existence fails to supply the substance necessary to justify treating the transaction as a sale *ab initio*. It is not necessary to the disposition of this case to decide the tax consequences of a transaction such as that before us if in a subsequent year the fair market value of the property increases to an extent that permits the purchaser to acquire an equity. [Fn. ref. omitted.]

We find the situation in the present case indistinguishable from that in *Estate of Franklin*. Taking into account all of the facts of this case—including the gross disparity between purchase price and fair market value, the absence of multiparty arm's-length dealing, and the circumstances surrounding payments under the net lease on the partnerships' nonrecourse

indebtedness—we conclude that the transaction in issue lacked from the outset the substance necessary to justify treating it as a sale.

Because of the absence of arm's-length dealing and of a sale at anything near fair market value, this case is in sharp contradistinction to the cases relied upon by petitioners. For example, in *Curry v. Commissioner*, 43 T.C. 667 (1965), we found a bona fide sale where the price paid for real property did not grossly exceed its fair market value. In *Commissioner v. Brown*, 380 U.S. 563 (1965), affg. 325 F.2d 313 (9th Cir. 1963), affg. 37 T.C. 461 (1961), the Supreme Court affirmed our finding of a sale where the price was arrived at in an arm's-length transaction. Similarly, in *Mayerson v. Commissioner*, 47 T.C. 340, 350 (1966), we found a sale, and not a lease, where the taxpayer acquired property in "an arm's-length transaction entered into between knowledgeable strangers for business motives."

The case before us also differs significantly from *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978). *Frank Lyon* involved a bank's sale and leaseback of its new building where State and Federal regulations made conventional financing infeasible. Sale, lease, and purchase-option terms in the sale and leaseback agreement were set after 5 months of hard arm's-length bargaining among the bank, the purchaser, and the financer of the transaction. The trial court found that the rents were reasonable throughout the period of the lease and that the option prices represented fair estimates of market value on the applicable dates. Because the parties' bargaining was based on realistic economic considerations, *Frank Lyon* is clearly distinguishable from the instant case.

Although petitioners contend otherwise, we come to the conclusion that 7th P.A. and 11th P.A. were not building equity in the 861 Building through CMC's lease payments. In support of their contention, petitioners point out that 7th P.A. and 11th P.A. were to have paid a total of $250,718 in principal after 5 years, $615,996 after 10 years, and $1,109,649 after 15 years. However, we believe these figures emphasize the fact that the partnerships were not developing an equity interest in the building. Even after 15 years of principal payments, the outstanding debt would still be substantially more than the building's original fair market value. Because of this huge disparity between the $1,800,000 purchase price and the fair

market value of less than $412,000, we conclude that at least during the years in issue, CMC's lease payments yielded no equity for the partnerships in the 861 Building. Under these circumstances, the partners in 7th P.A. and 11th P.A. would have nothing to lose by abandoning the transaction.

Petitioners also contend that because the sale of the 861 Building was structured without a balloon payment, the present case is distinguishable from *Estate of Franklin*. However, the lack of a balloon payment does not alter the key fact that the payments to JRYA were not producing equity in the property for the partnerships. This is clear from the vast difference between the fair market value and the purchase price, and we think the absence of a balloon payment is not a significant factor.

In short, it is eminently clear that the petitioners had no equity and were not building equity in the 861 Building; ergo, they at no time had an investment in the property which could be depreciated. Accordingly, the claimed depreciation deductions were properly disallowed. *Estate of Franklin v. Commissioner*, 544 F.2d at 1049.

Because of the excessive $1,800,000 price, the partnerships' debt to JRYA could have had economic significance only if the property were to have appreciated astronomically. Since the partnerships were not personally liable for the purchase price, there was only a mere chance that a genuine debt obligation would arise at some future time when the partnerships' obligation under the agreement of purchase would be reduced to a figure more in line with the building's fair market value. Thus, JRYA had not, in fact, advanced money to 7th P.A. and 11th P.A., nor had the partnerships secured the use or forbearance of money under the circumstances of this case. As the court stated in *Estate of Franklin v. Commissioner*, 544 F.2d at 1049: "For debt to exist, the purchaser, in the absence of personal liability, must confront a situation in which it is presently reasonable from an economic point of view for him to make a capital investment in the amount of the unpaid purchase price." Clearly, it would not have been reasonable for 7th P.A. and 11th P.A. to invest funds in the 861 Building in the amount of the unpaid purchase price, either at any time in the years at issue or at any foreseeable time. Therefore, respondent properly disallowed the interest deductions.

Petitioners argue that the facts in this case do not require that an equivalence be established between the purchase price and fair market value. They contend that the fact that the price was greater than the fair market value is insufficient reason to conclude that the transaction was not a sale for tax purposes. In support of this position, they rely on *Gyro Engineering Corp. v. United States*, 417 F.2d 437 (9th Cir. 1969), a case which involved depreciation of three apartment buildings sold to a corporation by its two principal shareholders. The trial court in *Gyro Engineering* concluded that the sales price was somewhat excessive in relation to fair market value. The terms of payment were such, however, that the Government's expert witness acknowledged that a hypothetical average investor would have entered into the agreement. On these and other facts, the court determined that the transaction was a sale. The facts in the present case are clearly distinguishable. The purchase price assigned by the limited partnerships to the 861 Building grossly exceeded its fair market value, and there is no indication that the average investor would have agreed to purchase it at that price.

Petitioners also cite *Union Bank v. United States*, 152 Ct. Cl. 426, 285 F.2d 126 (1961). They particularly call our attention to the following sentence in that opinion (285 F.2d at 128): "The fact that a purchaser of an asset pays more for it than it is worth does not, of itself, convert the sale into something other than a sale, for tax purposes." The next sentence, which petitioners fail to quote in their brief, is essential to understand the meaning of the first. "It may, at the most, suggest to a diligent tax collector that the transaction may have other features which belie its appearance." Neither this opinion nor the opinion of the Ninth Circuit Court of Appeals in *Estate of Franklin* is based solely on the absence of a fair market value sales price. Rather, the excessive contract price is the telling factor in the context of all the facts in this case, including those enumerated above. Certainly, by concentrating on the disparity between the purchase price and the fair market value of the 861 Building, we do not mean to imply that a sale will be disregarded for tax purposes merely because the purchaser pays too much. However, we believe the facts here are so similar to *Estate of Franklin* that they come within the holding and rationale of that case. If anything, the facts in *Estate of Franklin* were much more

favorable to that taxpayer than the totality of the facts in the instant case.

Since we have decided the case on the grounds set forth above, we do not need to consider respondent's other arguments. We hold that petitioners are not entitled to deductions for the claimed partnership losses.

Because other issues remain with respect to certain of these petitioners,

> *Decisions will be entered for the respondent in docket Nos. 4453–75, 4509–75, 4543–75, 5570–75, 8054–76, 8058–76, 8059–76, 8102–76, and 8103–76.*

> *An appropriate order will be issued with respect to docket Nos. 4541–75, 4542–75, 5632–75, 5937–75, 8101–75, 8311–75, 8051–76, 8053–76, 8057–76, 8101–76, and 9096–76.*