JOHN DEEGAN AND DOROTHY S. DEEGAN, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Deegan v. Commissioner
Docket Nos. 17328-80, 21919-81, 22949-81, 26288-81, 26708-81, 26709-81, 1844-82, 1846-82, 10069-82, 11052-82, 12907-82, 21656-82.
United States Tax Court
T.C. Memo 1985-219; 1985 Tax Ct. Memo LEXIS 414; 49 T.C.M. (CCH) 1421; T.C.M. (RIA) 85219; May 8, 1985. *414 Petitioners, limited partners in a partnership purportedly engaged in the acquisition and distribution of motion pictures, deducted their shares of partnership losses and claimed their shares of investment credits on partnership films. Held, partnership activities were not engaged in for profit and under sec. 183(b) petitioners are not entitled to deductions for their share of expenses under sec. 162(a) or sec. 212(1) and (2) or depreciation under sec. 167(a) or investment credit under sec. 38. Held,further, nonrecourse notes given in part payment of films were not genuine indebtedness and petitioners are not entitled to deduction for interest paid thereon under secs. 163(a) and 183(b). Herman Schwartzman,Howard L. Mann, for the petitioners. Martha Sullivan,Susan Grossman, for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: In these consolidated cases, respondent determined deficiencies in petitioners' Federal income taxes as follows: Petitioner(s)
Docket No.
Year
Deficiency
John Deegan and
17328-80
1975
$20,927.02
Dorothy S. Deegan
1977
681.00
Paul Schacknow
21919-81
1972
3,722.00
1975
43,664.00
1976
49,622.00
Stanley L. and
22949-81
1975
30,606.35
Jocelyn G. Manes
1976
22,252.25
Jesse M. and
26288-81
1975
[2] 22,541.54
Joan H. Farrow
1976
[2] 24,044.36
Max H. and
26708-81
1975
[2] 22,340.00
Eve J. Rhulen
1976
[2] 22,441.00
Walter A. and
26709-81
1975
29,361.69
Judith Rhulen
1976
25,836.63
Jerome and
1844-82
1975
35,747.00
Naomi Reiss
James P. and
1846-82
1975
29,396.00
Louise Kelley
1976
[2] 40,668.00
1977
45,770.00
Jerome and
10069-82
1978
1,651.89
Naomi Reiss
Harry E. and
11052-82
1977
5,064.00
Mary Danielson
1978
3,477.88
Steven Roy Schacknow
12907-82
1978
[2] 3,674.75
Harry E. and
21656-82
1975
28,438.00
Mary Danielson
1976
25,059.00
*415 The issues are (1) what amounts, if any, are petitioners entitled to deduct as their pro rata shares of the losses shown by their limited partnership on its returns for the years 1975, 1976, 1977, and 1978; and (2) what amounts, if any, are petitioners entitled to claim as their pro rata shares of investment tax credits with respect to two films purchased by the partnership in 1975. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by reference. All of petitioners except the Deegans (Docket No. 17328-80), the Kelleys (Docket No. 1846-82), and the Danielsons (Docket Nos. 11052-82 and 21656-82) were residents of New York at the time they filed their petitions herein. At the time they filed their petitions, the Deegans, the Kelleys and the Danielsons were residents of Florida. All petitioners had one or more shares of limited partnership interest in a partnership known as Northern Hills Associates which was formed in *416 June of 1975 by Ted Shapiro, as general partner, ostensibly to purchase and exhibit in the United States two foreign films, "If Don Juan Were a Woman" and "Don't Open the Window." Ted Shapiro, who was 39 years of age in 1975, graduated from City College of New York in 1957 with a degree in accounting. He then joined Kap Records, a manufacturer and producer of phonograph records. At Kap he served as an accountant, controller, assistant treasurer, director of business affairs and director of international operations. In 1969, he joined NMC Corporation as director, vice president of operations and treasurer. Shapiro left NMC in 1971 and became an independent financial consultant. In 1973, after several business ventures, he formed ICA Productions and he and Irving Cohen organized Irving Cohen and Associates. Shapiro and Cohen formed and promoted at least thirteen motion picture limited partnerships. Shapiro was the general partner in six of these limited partnerships including Northern Hills. [3] In 1976, Shapiro also organized and promoted at least five coal partnerships and two recording partnerships. All of these partnerships involved the use of nonrecourse financing and all reported *417 losses on their 1976 and 1977 returns. [4] *418 The offering memorandum dated May 19, 1975 and presented by Shapiro to petitioners and other prospective investors in Northern Hills described its anticipated tax benefits as follows: Although each investor must consider this program for its investment merits, we do anticipate substantial tax advantages in the years 1975, 1976 and 1977 (please note that while the units are completely paid for in 1975 and 1976, that additional tax advantages continue well beyond that period. For purpose of brevity, we have only projected the first three years): A. The depreciation and expenses in 1975 will develop deductions in a ratio of approximately 3.5 to 1 for each dollar invested. This means that approximately $42,000.00 of tax deductions in 1975 may be taken for the $12,000.00 paid during this period. B. The same approximate deductions as in "A" above are anticipated for 1976. C. Additional depreciation will be taken in 1977 in the amount of approximately $6,000.00 per unit; i.e., the total depreciation per $24,000.00 unit over three years is approximately $90,000.00. D.An investment tax credit of approximately *419 $6,000.00 per unit will be taken in 1975 thereby reducing the total netcash commitment for each unit to approximately $18,000.00. Please note that investment tax credit is a dollar-for-dollar reduction of tax and is not subject to "recapture" considerations. E. "Recapture" or forgiveness of debt, if it occurs at all, will be taken in thirteen(13) years. The only reference in the offering memorandum to the desirability of Northern Hills as an investment appears in the summary portion which reads as follows: Continued popularity of this type of investment is predicated upon several fundamental factors: 1. The investor has an opportunity to own two excellent pictures wherein substantial profits can be realized for many years through both theatrical and non-theatrical avenues. 2. A relatively small amount of cash is required. 3. A substantial investment tax credit saves investor's dollar immediately. 4. A fairly high but conservative leveraging of dollars is both legal and proper. 5. The long term "recapture" enables the investor to conserve and use today's cash while meeting his ultimate tax requirements, if any, with inflated dollars and profits. The confidential memorandum *420 dated June 11, 1975 and issued by Shapiro for Northern Hills warned that "Only a small percentage of all motion pictures generate a profit (after recoupment of the cost of a picture) to the owners of such pictures. Accordingly, there is a substantial degree of risk that exploitation of the Pictures will not yield profits to the Partnership and the Partners, and that Investors may not recoup all or any portion of wheir capital contributions to the Partnership." The memorandum also states that in order for the partnership to pay off the nonrecourse notes issued for the films, the film "If Don Juan Were a Woman" would have to generate $3,950,000 of distributor's gross receipts. Appraisals attached to the confidential memorandum stated that gross receipts from the film "Don't Open the Window" should equal $1,850,000 to $2,000,000. Attached appraisals also projected gross revenues of $4,500,000 for "If Don Juan Were a Woman." The confidential memorandum discusses the possible impact of Section 183 as follows: Section 183 of the Internal Revenue Code provides limitations for deductions attributable to "activities not engaged in for profit." The term "activities not engaged in for profit" *421 means any activity other than one that constitutes a trade or business, or one that is engaged in for the production or collection of income or for the management, conservation, or maintenance of property held for the production of income. The determination of whether an activity is engaged in for profit is based on all facts and circumstances and no one factor is determinative. Since the test of whether an activity is deemed to be engaged in for profit is based on facts and circumstances from time to time, and may be based upon the particular objective and circumstances of individual Limited Partners, notwithstanding any profit objective the Partnership itself may be deemed to have, no assurance can be given that Section 183 may not be applied in the future to disallow deductions taken by one or more of the individual Limited Partners with respect to their Interest in the Partnership. In the confidential memorandum the limited partners were advised that Shapiro as general partner would "have the exclusive management and control of all aspects of the business of the Partnership." They were also advised that for his services as general partner Shapiro would receive a one time management *422 fee of $25,000 plus an annual compensation equal to 2 percent of the partnership's cash flow and that Shapiro and his associate, Irving Cohen, would receive organizational fees of $131,600 which included all finders fees, appraisal fees and legal fees associated with the formation of the partnership and the acquisition of the films. The limited partnership agreement for Northern Hills was executed on June 11, 1975. In July of 1975 each petitioner as a limited partner purchased one or more shares representing a 2.79 percent interest in the partnership for $24,000 per share. Shapiro, the general partner, purchased his five percent interest for $2,000. For each of their shares limited partners made an initial cash contribution of $12,000 and executed a $12,000 note payable in 1976. To qualify as a limited partner, each petitioner had to warrant that they had a net worth of at least $200,000 and that they were subject to a Federal income tax rate of 50 percent or higher. Harold Rand (Rand), was a general partner in three of the Shapiro/Cohen motion picture partnerships. Rand met Shapiro through a business associate in 1974. He served as a "finder" for Northern Hills of the films, "If *423 Don Juan Were a Woman" and "Don't Open the Window," and was paid a finder's fee of $25,000 for each film. "If Don juan Were a Woman"
In 1975 Rand introduced Shapiro to Frederick Walker (Walker), a New York attorney representing foreign film sellers, one of which was Air Trans Establishment (Air Trans). [5] Air Trans was a Liechtenstein business entity that wished to sell "If Don Juan Were a Woman" [6] which it had acquired in February of 1975 for an undisclosed amount. "If Don Juan Were a Woman" is an adult motion picture concerning the exploits of a female Don Juan. It was produced outside the United States and prior to 1975 had been exhibited in Europe. The film stars Brigitte Bardot and was directed by Roger Vadim, the *424 star and director of the very successful film entitled "And God Created Woman," which was released in 1956. The original soundtrack of the film was in French but English had been dubbed in. Negotiations for the purchase and sale of the film were conducted by Shapiro and Walker. The purchase agreement dated August 15, 1975, recites a total purchase price of $1,800,000 of which $200,000 was to be paid in cash and the balance of $1,600,000 was to be paid in 12 years together with interest at 6 percent per annum but both principal and interest were payable solely out of 70 percent of the net distribution proceeds received from the film, which was defined as the money actually received by the exhibitors, distributors, and franchise holders less all fees and expenses of exploitation and distribution. Payments on the note were to be first applied to accrued interest and then to principal. Although the agreement recited that the film was to be security for payment of the note, the record contains no evidence that the security interest was ever perfected. Neither the partnership nor any general or limited partner was liable for any part of the note. Walker recommended that Shapiro use *425 one of Walker's clients, Scotia American Productions, as distributor for "If Don Juan Were a Woman." Peter Kares and Sidney Ginsburg, agents for Air Trans, seller of the film, were also the principal officers and shareholders of Scotia. A distribution agreement was negotiated by Weiss, Rosenthal, Heller & Schwartzman as attorneys for Northern Hills and Frederic Walker as attorney for Scotia. The agreement dated August 15, 1975 provided that prior to October 1, 1975, Scotia would exhibit the film in at least one city in the United States with a population exceeding one million; exhibit the film in at least fifty theaters prior to December 31, 1976; and in a total of at least 250 theaters. Northern Hills had the right to cancel the agreement upon 10 days written notice in the event Scotia failed to fulfill its distribution obligations. Northern Hills also had the right to cancel the agreement in the event that Scotia failed to obtain gross receipts of $500,000 within the first three years of distribution. Scotia was to bear all costs of distribution and expend no less than $50,000 on exploitation, advertising and promotion of the film. Under the distribution agreement the total *426 gross receipts from the film were to be distributed as follows: Northern Hills was to receive 45 percent of the first $250,000; 50 percent of the next $250,000; 55 percent of the next $250,000; and 60 percent of receipts exceeding $750.000. Scotia also agreed to furnish Northern Hills with quarterly statements of receipts and to make its accounting records available for inspection by Shapiro. Peter Kares and Sidney Ginsburg, agents for Air Trans, also furnished Shapiro with three appraisals of the film. In each appraisal it was stated that the value of the picture was equal to its purchse price. The appraisals are dated May 29, and 30, 1975 but the checks given in payment of the appraisal fees are dated 1976. In each appraisal it is estimated that the gross revenues from "If Don Juan Were a Woman" would be $4,500,000. Shapiro made no economic projections in an attempt to determine the film's potential for profit because he felt the box office receipts were too speculative to make such a determination. "If Don Juan Were a Woman" opened in Texas and Oklahoma in December of 1975. Its opening, according to Peter Kares of Scotia, was a "disaster." By letter dated February 9, 1976, Sidney *427 Ginsburg of Scotia advised Shapiro that as of that date no money had been collected on the 1975 engagements of the film. In a letter dated February 25, 1976, Ginsburg informed Shapiro that during 1975 the film had been exhibited in about 40 percent of Scotia's market and that Scotia expected to collect gross revenues of approximately $2,400 for 1975. In the letter Ginsburg also stated: We do, however, have a strong outlook for 1976 and have in fact just broken the picture in the Atlanta and Jacksonville territory in twenty-five theaters. From the initial response from the public and the exhibitors we look forward to a much brighter outlook on this picture. We intend to redouble our efforts and try out some novel advertising approaches to help in the commercial success of the picture. By letter dated February 3, 1977 Ginsburg indicated that by the end of 1976 the film had appeared in 85 percent of Scotia's market and that gross revenue for 1976 would be about $2,000. Ginsburg again stated: We do, however, have a strong outlook for 1977 and have in fact just broken the picture in the Atlanta and Jacksonville territory in twenty-five theaters. From the initial response from the public *428 and the exhibitors we look forward to a much brighter outlook on this picture. We intend to redouble our efforts and try out some novel advertising approaches to help in the commercial success of the picture. [7]
In 1977 Scotia received total receipts of $211.22 from the film. Through the date of trial Northern Hills Associates had never received any payment as the result of the exhibition of "If Don Juan Were a Woman," and Scotia ceased doing business in 1980. At the date of trial the film was being distributed in a video cassette version which was not available during the years under consideration and the record contains no indication of the receipts from its exhibition after 1977. "Don't Open the Window"
In 1975 Harold Rand also introduced Robert Bardey to Shapiro. Bardey, an attorney, was representing Les Producteurs, a Liechtenstein corporation, which desired to sell the film "Don't Open the Window." [8] Les Producteurs had purchased the film for an undisclosed amount in March of 1975. It was a Spanish-Italian made film about living *429 corpses and starred Arthur Kennedy. Negotiations for the film's purchase were conducted by Shapiro and Bardey. As stated in the purchase agreement dated August 20, 1975, the total purchase price was $1,850,000 of which $1,795,000 was for pre-print materials, $50,000 for copyrights, and $5,000 for the release of the color print. Of the purchase price $350,000 was to be paid in cash and the balance was to be represented by Northern Hills' nonrecourse note for $1,500,000 bearing interest at the rate of 6.25 percent per annum. Both principal and interest were payable in 12 years but were payable solely from 65 percent of the net distribution proceeds of the film. Payments were to be applied first to accrued interest and then to the principal. The agreement recited that the note was secured by the film but the record contains no evidence that the security interest was ever perfected or that Northern Hills ever obtained a copyright for the film or insured the negatives or prints. Again the agreement recited that neither the partnership *430 nor any general or limited partner was liable for any part of the note. On August 20, 1975 Northern Hills entered into a distribution agreement with Hallmark Releasing Corporation who was represented by Steven Minasian. Hallmark, whose previous distributions had been limited to New England, agreed that it would (1) not enter into a subdistribution agreement without the prior written consent of Northern Hills; (2) exhibit the film in a city of at least one million persons within six weeks; (3) spend not less than $50,000 for advertising; and (4) obtain a minimum of one hundred play dates within six months after delivery of the film. Northern Hills had the right to cancel the agreement upon the failure of Hallmark to perform any of these duties. Northern Hills was to receive 50 percent of the first $150,000 in gross receipts from the film, 55 percent of the next $100,000, and 60 percent of the excess over $250,000. Hallmark was to keep accurate books of account and render quarterly statements to Northern Hills and Northern Hills had the right to inspect all books of account with 48 hours notice. The law firm of Weiss, Rosenthal, Heller and Schwartzman prepared the distribution agreement *431 for Northern Hills. Hallmark exhibited the film in a few test areas in 1975. The effort failed, however, and Hallmark received no money as a result of the distribution of the film during 1975, but Minasian sent Shapiro a report estimating that 40 percent of the market for the film had beem exploited by the end of 1975. In late 1975 and early 1976 Hallmark began experiencing extreme financial difficulties and on June 23, 1976 entered into a subdistribution contract with American International Pictures (AIP) and Shapiro consented to the new contract on behalf of Northern Hills. Hallmark ceased operations at or about this time. Under AIP's distribution agreement, Northern Hills was to receive 15 percent of the first $1,000,000 of domestic theatrical gross receipts, 25 percent of the second $1,000,000; 35 percent of the third $1,000,000; 45 percent of the next $2,000,000 and 50 percent of all additional domestic theatrical gross receipts. Under AIP's distribution efforts, the film enjoyed some box office success and up to the date of trial, the film had earned gross box office receipts of $2,500,000 and AIP had reported $870,142.06 in distribution receipts, and had paid Northern Hills *432 $92,896.80 under their distribution agreement. In the motion picture business it is generally agreed that the owner or exhibitor of a film can expect to receive about 44 percent of the box office receipts generated by the film. Through the date of trial Northern Hills had made no interest or principal payment on the nonrecourse note issued with respect to "If Don Juan Were a Woman." During 1977 Northern Hills paid $56,154.83 to Les Producteurs on the $1,500,000 note issued as part payment for the film "Don't Open the Window." This payment was applied to accrued interest on the note. On its partnership returns for 1975 through 1978 Northern Hills reported losses as follows: Year
Loss
1975
$1,562,719
1976
1,776,013
1977
344,188
1978
215,402
TOTAL
$3,898,322
The losses for the most part was attributable to deductions for depreciation claimed by the partnership with respect to the total cost of $3,650,000 for the two films, including the nonrecourse notes, and interest accrued but not paid on such notes. The balance of the loss for each year was attributable to amortization of organizational costs plus the deduction of management fees and certain miscellaneous expenses. On its 1975 return Northern *433 Hills reported it had $3,650,000 invested in property which qualified for an investment credit of 10 percent or $365,000. On their individual returns for 1975 through 1978 petitioners deducted their pro rata shares of the partnership losses. On their 1975 returns they claimed their shares of the investment credit on the films. OPINION The ultimate issues to be decided in these consolidated cases are (1) whether petitioners as limited partners are entitled to deduct some part or all of their pro rata shares of the partnership losses reported by Northern Hills for the years 1975 through 1978, and (2) whether petitioners are entitled to claim their pro rata shares of investment tax credit with respect to the motion pictures, "If Don Juan Were a Woman" and "Don't Open the Window." Respondent's primary contention, and the one we must dispose of first, is that the motion pictures were acquired and that the partnership losses were incurred in an activity not engaged in for profit. Consequently, respondent concludes that petitioners are entitled to deduct the partnership losses only in accordance with section 183 and that petitioners are not entitled to the investment credits under section 48(a). *434 Petitioners contend that the partnership activity was engaged in for profit, that section 183 is not applicable, and that their claimed deductions and credits are allowable in full. [9]
Section 183(a) provides that if an individual's activity constitutes an activity "not engaged in for profit," the deductions arising out of such activity shall not be allowed except as provided in section 183(b). An "activity not engaged in for profit" is defined in section 183(c) as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 [trade or business expenses] or under paragraph (1) [expenses for the production or collection of income] or (2) [expenses for management conservation or maintenance of income producing property] of section 212." If the activity is not engaged in for profit, section 183(b) requires that the claimed deductions be divided into two groups. First, section 183(b)(1) allows the deduction in full of those deductions which are not dependent upon an profit motive, e.g., interest and taxes. Then, *435 under section 183(b)(2) the balance of the deductions are allowed but only to the extent that the gross income derived from the activity exceeds the deductions allowed under section 183(b)(1). Section 48(a) allows an investment credit only with respect to certain personal property which qualifies for depreciation under section 167(a). Under section 167(a) a depreciation deduction is allowed for (1) property used in a trade or business or (2) property held for the production of income. Property held in an activity not engaged in for profit is not depreciable and therefore does not qualify for investment credit. In order to constitute the carrying on of a trade or business under section 162 an activity must "be entered into, in good faith, with the dominant hope and intent of realizing a profit, i.e., taxable income, therefrom." Hirsch v. Commissioner,315 F.2d 731, 736 (9th Cir. 1963), affg. a Memorandum Opinion of this Court. See also Hager v. Commissioner,76 T.C. 759, 784 (1981), ant the cases cited therein. The expectation of a profit need not be a reasonable one. It is sufficient if there is a bona fide objective of making a profit. Fox v. Commissioner,80 T.C. 972, 1006 (1983), *436 affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner,731 F.2d 230 (4th Cir. 1984), affd. without published opinions sub nom. Hook v. Commissioner,Kratsa v. Commissioner,Leffel v. Commissioner,Rosenblatt v. Commissioner,Zemel v. Commissioner,734 F.2d 5-7, 9 (3d Cir. 1984); Hager v. Commissioner,supra.Whether there is an intention to make a profit is one of fact to be resolved from all of the surrounding facts and circumstances. Golanty v. Commissioner,72 T.C. 411, 426 (1979), affd. in an unpublished opinion 647 F.2d 170 (9th Cir. 1981); Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). The burden of proof with respect to the requisite intention is on petitioners. Rule 142(a); Golanty v. Commissioner,supra at 426. In making the determination as to intent, objective facts are to be given greater weight than the parties' statements of their intent. Fox v. Commissioner,supra at 1007. Whether a partnership is engaged in a trade or business with the intent of making a profit is to be determined at the partnership leve. Fox v. Commissioner,80 T.C. at 1006; Siegel v. Commissioner,78 T.C. 659, 698 (1982); *437 Brannen v. Commissioner,78 T.C. 471, 505 (1982), affd. 722 F.2d 695 (11th Cir. 1984). In determining the profit intent of a limited partnership where the conduct of the partnership's affairs was left to the general partner, attention must be focused upon the general partner's knowledge, conduct, expertise and success in the particular field as well as any other factor which he relied upon in making partnership decisions. See, Siegel v. Commissioner,supra;Brannen v. Commissioner,supra;Hager v. Commissioner,supra.
Section 1.183-2(b), Income Tax Regs., contains a nonexclusive list of several factors which have been considered previously in various cases as being relevant to a determination of whether an activity was engaged in for profit. Golanty v. Commissioner,supra.From that list we find that the following factors are relevant to the cases before us: (1) the manner in which the activity was conducted; (2) the expertise of the taxpayer or his advisors or associates; (3) the time and effort expended in carrying on the activity; (4) the expectation that assets used in the activity might appreciate in value; (5) the success of the activity and of the taxpayer in carrying on *438 other similar or dissimilar activities; (6) the amount of profits, if any, which were earned; and (7) the financial status of the taxpayer. None of petitioners appeared at the trial. Through counsel it was conceded that they had no experience in the purchase or exhibition of motion pictures and did not participate in any way in the conduct of the affairs of Northern Hills. In fact it was conceded that during the years under consideration the affairs of Northern Hills were the sole responsibility of Ted Shapiro, the general partner of the partnership. Therefore, we must direct our attention to his knowledge, experience, expertise, and conduct in determining whether or not the purchase and exhibition of the two films by the partnership was or was not an activity engaged in for profit. From a close examination of the record as a whole we are satisfied and so find that the activity engaged in by petitioners through their limited partnership was not a trade or business or an undertaking for the production of income. Rather, we are convinced that petitioners and their partnership engaged in the activity primarily, if not exclusively, in order to obtain tax deductions and credits. In *439 comparison to the projected tax "write-offs," the activities of Ted Shapiro, the general partner, demonstrate a total indifference and unconcern for profit. First, the offering memorandum circulated to petitioners focused almost exclusively on the anticipated tax benefits. There was no specific discussion of the amount or even the likelihood of profits which an investor might expect. The memorandum simply stated without any explanation that substantial profits could be realized for many years. However, from a close examination of the memorandum and the attached appraisals we are convinced that even if the films had done as well as Shapiro's optimistic appraisers predicted, the partnership would not have been able to pay off the principal and interest due on the nonrecourse notes much less provide any return above the purchase price. [10]
*440 Second, it is also evident that the films were acquired at highly inflated prices. Shapiro obligated the partnership to pay $1,800,000 to Air Trans for "If Don Juan Were a Woman." Although Shapiro received three appraisals at the purchase price for the film, the appraisers were officers of the distributor and agents of the seller. With respect to "Don't Open the Window" Shapiro obligated the partnership to pay $1,850,000, the amount shown on three appraisals, but again the circumstances surrounding the appraisals are suspicious. Harold Rand, who introduced Shapiro to the sellers of this film, furnished the appraisers. In addition, the checks that Shapiro wrote on behalf of the partnership to the appraisers cleared the bank over a year after the purchase was made and the checks were purportedly written. Other facts surrounding the acquisition of the films clearly reflect Shapiro's lack of care, or lack of interest, in ascertaining their fair market value. For example both sellers had acquired the films only a few months before entering into sales agreements with Northern Hills but Shapiro did not inquire as to their purchase price nor did he think it was particularly pertinent information. *441 Although both sellers made representations concerning the films' production budgets and European box office receipts, Shapiro was unable to produce persuasive documentary evidence of these figures at trial. In addition Shapiro did not produce the certificates of entry into the United States for the films. These certificates would have revealed their estimated value. Respondent's expert as to the value of the films, in August of 1975 was William Madden, who has a lengthy career in the motion picture industry with concentration on the purchase and distribution of films. As a former vice president and general sales manager at Metro Goldwin Mayer he was in charge of purchasing and marketing films throughout the country and handled distribution and marketing for smaller production companies as well as independent producers. He is currently a teacher of "Marketing and Distribution in the Motion Picture Industry" at the University of California at Los Angeles. With respect to "If Don Juan Were a Woman," Madden concluded that at the time it was acquired by Northern Hills it could not have been expected to earn sufficient money to cover its marketing expenses. He agreed that the picture *442 had some positive aspects in the areas of visual style and photographic effects, but that overall it was poorly made and poorly edited with a confusing story line and that it would not be able to generate more than a few bookings in the United States and Canada. He estimated that total film rentals would amount to about $10,000 but that marketing costs would amount to over $23,000 leaving the distributor with a net loss. In his opinion the film had no fair market value in 1975. Mr. Madden appraised the domestic theatrical rights for "Don't Open the Window" as of August 1975 at $12,500 based on estimated film rental receipts of $300,000 which would have to be reduced by marketing costs to a net cash flow of $25,000. Mr. Madden then applied a 50 percent discount to the net cash flow figure to account for the risks and the profit margin he anticipated. In light of the admittedly speculative nature of the movie industry, a 50 percent discount for risk and profit appears to be reasonable. Furthermore, the fact that the film rentals amounted to $812,673, while his appraisal was based on estimated rentals of $300,000, does not destroy the validity of the appraisal. Without the benefit *443 of hindsight, it would be difficult to say that a prudent buyer in August of 1975, would have paid more than $12,500 for the theatrical rights to "Don't Open the Window." Petitioners presented three experts at trial as to the fair market value of the films. Their first expert, Bert Schneider, is a television and movie producer.He testified that in his opinion the purchase price paid for each film was fair and reasonable. He also testified that in his opinion there is no relationship between the fair market value of a film and its gross box office receipts. Petitioner's second expert was Robert French, an attorney who had served on the legal staff at Warner Communications. He had also been a director of business affairs for United Artists, and had worked for a company which prepared investment offerings for motion pictures to limited partnerships. Mr. French also testified that in his opinion each film was worth its purchase price. Harry Block, petitioners' final expert, had worked in motion picture marketing and distribution for Fourteen years. He testified that he would have no problem valuing the films at their purchase prices but he did not know anyone who would pay those amounts *444 for the pictures. All three of petitioners' experts carefully avoided the use of the phrase "fair market value" with reference to their appraisals of the films. They repeatedly made comments to the effect that each film was worth its "purchase price" or the "price stated for its purchase." The use of such phrases permitted them to include in their appraisals the fact that in each instance the "purchase price" consisted for the most part of a substantial nonrecourse note which had questionable fair market value to say the least. By comparison we found respondent's expert to be a much more credible witness and conclude from his testimony that petitioners have failed to establish that "If Don Juan Were a Woman" had any fair market value on the date of its acquisition by Northern Hills and that "Don't Open the Window" did not have a fair market value in excess of $12,500 on the date of its acquisition. Obviously the use of nonrecourse notes to represent substantial portions of the inflated purchase price provided significant tax benefits through an increase in the basis of the films for depreciation and investment tax credit. The nonrecourse notes also served as a basis for computing *445 deductions for accrued but unpaid interest expenses. Of course, the use of large nonrecourse notes compared to small cash investments does not necessarily prohibit a finding of a profit objective, but in this case it is a negative factor for petitioners because the record contains no evidence of a practical way to pay the notes. Barnard v. Commissioner,731 F.2d 230, 231 (4th Cir. 1984), affg. sub nom. Fox v. Commissioner,80 T.C. 972 (1983); Estate of Baron v. Commissioner,83 T.C. 542, 556 (1984). With the use of the nonrecourse notes investors in Northern Hills could realize a significant "return" through their tax benefits even if the films were never exhibited at all. Shapiro's offering memorandum promised each investor deductions totaling $42,000 for depreciation and interest in the first year plus an investment credit of $6,000 for only a $12,000 cash investment. However, as we stated in Estate of Baron v. Commissioner,83 T.C. at 557-558, the realization of a return on an investment solely through tax benefits is not "determinative of the existence of the necessary profit objective in determining the applicability of section 183. If such standard were the sole criterion, *446 we would have the ridiculous situation that the lower the amount of the cash investment and the higher the amount of nonrecourse financing, the more likely would be the existence of a profit objective." Furthermore, when presented with this financial structure the partnership purchaser of the films would have little or no incentive to negotiate for a lower nonrecourse liability because any reduction here would have resulted only in a corresponding reduction in the partnership's basis for depreciation, investment tax credit and the computation of its interest deduction. This in turn would serve to decrease the tax benefits to the limited partners. Cf. Fox v. Commissioner,supra at 1009. The record contains other evidence that the activities of the partnership were not conducted in a businesslike manner. Our findings of fact detail not only that Shapiro accepted appraisals of the films provided by their sellers, he also did not make any attempt to obtain independent appraisals during the negotiations for their purchase. Moreover, he did not investigate the distributors recommended to him by the sellers nor did he attempt to find other distributors. Had he investigated Hallmark, he *447 would have found that it was a small regional distributor experiencing severe financial difficulties. If he had investigated Scotia he would have found that the company was owned by agents of the seller of the film he was negotiating to buy. A prudent businessman would not have accepted the distribution efforts of Scotia but even after he became aware of its dismal distribution efforts with respect to "If Don Juan Were a Woman" Shapiro did not attempt to exercise his rights of cancellation under the distribution agreements. Shapiro testified that he engineered the subdistribution agreement between Hallmark and AIP, but other evidence clearly shows that the subdistribution arrangement was the result of efforts by Hallmark. Shapiro's expertise, if any, in the distribution of motion pictures is also questionable. His background was in accounting and business management. He had been a financial consultant and had formed many limited partnerships. From the record as a whole it is apparent that his expertise was in creating tax shelters, not in the purchase of films or overseeing their distribution. Moreover, Shapiro's advisors were the members of the law firm of Weiss, Rosenthal, *448 Heller & Schwartzman. This firm prepared opinion letters, sales agreements, and distribution agreements for Shapiro's partnerships. The record contains no evidence that the firm had any special expertise in the film area. Other factors which affect our decision are the following: (1) The record contains no evidence of the actual time or effort expended by Shapiro[11] during the years under consideration in carrying on the activities of Northern Hills but during this period he organized five other motion picture partnerships, all of which reported losses in the years in issue, and he was involved in limited partnerships dealing with coal mining, master recordings and the distribution of books, all of which also reported substantial losses; (2) There was little expectation that the films would appreciate in value because at the end of the first year of distribution, Shapiro determined that 41 percent of the films' markets had already been exploited; (3) Northern Hills reported losses for all the years in issue and the magnitude of such losses, particularly when compared with the miniscule amounts of gross income and no net income reported during the years, we find to be "premium evidence" *449 that no profit objective existed. See Golanty v. Commissioner,72 T.C. 411 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). Since we have concluded that the partnership constituted an activity not engaged in for profit, both it and its limited partners are not entitled to business deductions under section 162, depreciation deductions under section 167, or the investment credit under section 48(a). [12] We now turn to section 183 to determine the amount, if any, of the deductions which are otherwise allowable under section 183(b). This issue is also determined at the partnership level. Brannen v. Commissioner,78 T.C. at 513. Specifically *450 this issue is limited to the $56,154.83 in interest which respondent concedes was paid in 1977 on the nonrecourse note for $1,500,000 given by Northern Hills to Les Productions. Section 163(a) allows a deduction for "all interest paid or accrued within the taxable year on indebtedness." For the deduction to be allowable, however, the indebtedness must be genuine. In Hager v. Commissioner,76 T.C. 759, 773-774 (1981), we stated: It is settled that amounts paid as interest must be paid on genuine indebtedness to be deductible under section 163(a) ( Knetsch v. United States,364 U.S. 361 (1960); Narver v. Commissioner,75 T.C. 53, 98 (1980), on appeal (9th Cir., Jan. 15, 1981); Golsen v. Commissioner,54 T.C. 742, 754 (1970), affd. 445 F.2d 985 (10th Cir. 1971)) * * *. In the usual sale of property, if part or all of the purchase price is deferred, the obligation to pay the deferred amount represents genuine indebtedness and an investment in property. Even if such an obligation *451 is secured only by the transferred property or other property and the buyer has no personal liability for its payment, the obligation still represents genuine indebtedness and an investment in property. Mayerson v. Commissioner, [47 T.C. 340 (1968)] at 351-352; see Crane v. Commissioner,331 U.S. 1 (1946). However, such conclusions do not follow when the principal amount of such nonrecourse indebtedness unreasonably exceeds the value of the security therefor because, under such circumstances, it is patent that the purchaser has no incentive to pay off the obligation. If the purchase price and the principal amount of the nonrecourse note unreasonably exceed the value of the property to be purchased, then no "genuine indebtedness exists." [13]Estate of Franklin v. Commissioner,544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975); Hager v. Commissioner,76 T.C. 759 (1981); Odend'hal v. Commissioner,80 T.C. 588, 604-605 (1983), affd. on this issue 748 F.2d 908 (4th Cir. 1984). In Estate of Franklin v. Commissioner,544 F.2d at 1048-1049, the Court of Appeals stated the rationale as follows: An acquisition such as that of Associates if at a price approximately equal to the fair market *452 value of the property under ordinary circumstances would rather quickly yield an equity in the property which the purchaser could not prudently abandon. This is the stuff of substance. It meshes with the form of the transaction and constitutes a sale. No such meshing occurs when the purchase price exceeds a demonstrably reasonable estimate of the fair market value. Payments on the principal of the purchase price yeidl no equity so long as the unpaid balance of the purchase price exceeds the then existing fair market value. Under these circumstances the purchaser by abandoning the transaction can lose no more than a mere chance to acquire an equity in the future should the value of the acquired property increase. While this change undoubtedly influenced the Tax Court's determination that the transaction before us constitutes an option, we need only point out that its existence fails to supply the substance necessary to justify treating the transaction as a sale ab initio. It is not necessary to the disposition of this case to decide the tax consequences of a transaction such as that before us if in a subsequent year the fair market value of the property increases to an extent that *453 permits the purchaser to acquire an equity. [Footnotes omitted.] The Court also said (544 F.2d at 1049): To justify the [interest] deduction the debt must exist; potential existence will not do. For debt to exist, the purchaser in the absence of personal liability, must confront a situation in which it is presently reasonable from an economic point of view for him to make a capital investment in the amount of the unpaid purchase price. * * * We have already concluded that the nonrecourse notes in these cases were not given in connection with a bona fide profit-seeking activity. In reaching this conclusion, we carefully *454 reviewed the expert testimony of both parties as to the value of the films, and found that although the total purported "consideration" for the films was $3,650,000 they had a total fair market value of only $12,500. Moreover, we also found that there would not have been sufficient receipts to liquidate the $3,100,000 represented by the nonrecourse notes even if the films had done as well as the appraisers predicted in the offering materials. Therefore, the note for $1,500,000 on which the $56,154.83 was paid does not constitute a genuine indebtedness and the interest is not deductible under section 183(b). Due to concessions, Decisions will be entered under Rule 155.
Footnotes
1. The following cases have been consolidated for purposes of trial, briefing, and opinion: Paul Schacknow, Docket No. 21919-81; Stanley L. and Jocelyn G. Manes, Docket No. 22949-81; Jesse M. and Joan H. Farrow, Docket No. 26288-81; Max H. and Eve J. Rhulen, Docket No. 26708-81; Walter A. and Judith Rhulen, Docket No. 26709-81; Jerome and Naomi Reiss, Docket No. 1844-82; James P. and Louise Kelley, Docket No. 1846-82; Jerome and Naomi Reiss, Docket No. 10069-82; Harry E. and Mary Danielson, Docket No. 11052-82; Steven Roy Schacknow, Docket No. 12907-82; and Harry E. and Mary Danielson, Docket No. 21656-82.↩
2. These dockets involve adjustments which are attributable to other issues but by agreement of the parties these issues have been severed from this case.↩
3. SCHEDULE I Date
Management
Partnership
Film
Formed
Fee
Brighton
1. The Winners
12/75  $43,000.00
Associates
2. Suspects
3. Double Face
Asbury
1. Paper Tiger
10/21/75
$45,000.00
Associates
2. Story of Adele H
3. Marriage Year Two
Newtown
1. Dragon Fly
8/75  $40,000.00
Associates
2. Deadly Strangers
3. The Martyr
Woodhaven Information not available at time of trial
*
Associates
Avalon
Associates
1 The Killer
Inside me
12/75  $45,000.00
2. Goose Chase
Purchase Price
Partnership
Cash
Nonrecourse Note
Brighton
$310,000 $2,190,000
Associates
190,000 1,310,000
100,000 650,000
Asbury
$475,000
2,525,000
Associates
390,000
1,910,000
215,000
2,085,000
Newtown
490,000
2,035,000
Associates
200,000
1,750,000
185,000
1,515,000
Woodhaven *
Associates
Avalon
Associates
400,000
2,700,000
175,000
1,825,000
↩
Net Income
Partnership
1975
1976
1977
1978
Brighton
($1,451,750)
($2,812,747)
($526,060)
($319,494)
Associates
Asbury
($2,590,897)
($3,969,613)
($802,195)
Associates
Newtown
($2,332,096)
($2,773,247)
($783,285)
Associates
Woodhaven *
Associates
Avalon
Associates
None
Filed
($2,360,189)
($2,293,882)
4. SCHEDULE II Date
Management
Purchase Price **
Partnership
Asset
Formed
Fee
Cash
Nonrecourse Note
Cedar Hill
Associates
coal
10/20/76
$50,000
$425,000.00
$2,500,000.00
Montclair
Associates
coal
10/28/76
80,000
600,000.00
3,900,000.00
Saddle River
Associates
coal
10/28/76
35,000
300,000.00
1,810,000.00
Upper Saddle
River
Associates
coal
10/28/76
Information not available at time of trial ** Amount of advance royalty in coal partnerships
*
*
*
Maplewood
Associates
coal
10/28/76
220,000
1,250,000.00
7,500,000.00
Present Tense
Associates
records
1976    35,000
205,000.00
1,225,000.00
Future Tense
Associates
records
12/76   35,000
205,000.00
1,315,000.00
↩
Net Income
Partnership
1976
1977
1978
Cedar Hill
Associates
($2,995,745)
($47,867)
($143,197)
Montclair
Associates
($4,588,867)
N/A
N/A
Saddle River
Associates
($2,166,496)
($90,647)
($140,699)
Upper Saddle
River
Associates
*
*
*
Maplewood
Associates
($9,002,699)
($446,071)
*
Present Tense
Associates
($529,044)
*
*
Future Tense
Associates
($543,300)
($917,224)
*
5. Frederick Walker also acted as attorney for sellers of foreign films to three other Shapiro motion picture partnerships as indicated below: ↩
Partnership
(Purchaser)
Seller
Film
Brighton Associates
T.C. Investments
"Double Face"
Newtown Associates
Air Trans Establishment
"Deadly Strangers"
Asbury Associates
Air Trans Establishment
"Paper Tiger"
Asbury Associates
Robjohn Investments, Ltd.
"The Story of
Adele H"
6. This film was also known as "Ms. Don Juan" and "If Don Juan Were a Lady."↩
7. On February 25, 1976, Mr. Ginsburg also issued letters containing this language to Ted Shapiro on behalf of Newton Associates and Brighton Associates.↩
8. The film was also entitled "The Living Dead at the Manchester Morgue" and "Let Sleeping Corpses Lie." We will refer to the film as "Don't Open the Window."↩
9. Although the parties briefed other issues we find it unnecessary to address them in light of our decision on this issue.↩
10. ↩
Estimated Gross from
"If Don Juan Were a Woman"
$4,500,000
Less 56 percent for Distribution
2,520,000
Balance (44 percent)
1,980,000
Northern Hills' Share of Balance
45 percent of first $250,000
112,500
50 percent of next $250,000
125,000
55 percent of next $250,000
137,500
60 percent of excess ($1,230,000)
738,000
Estimated Total
1,113,000
Nonrecourse Note (Principal only)
1,600,000
Difference
487,000
Estimated Gross for
"Don't Open the Window"
$2,000,000
Less 56 percent for Distribution
1,120,000
Balance (44 percent)
880,000
Northern Hills' Share of Balance
50 percent of first $150,000
75,000
55 percent of next $100,000
55,000
60 percent of excess ($630,000)
378,000
Estimated Total
508,000
Nonrecourse Note (Principal only)
1,500,000
Difference
992,000
11. The lack of evidence on this point may be attributable to the fact that after receiving his one time managerial fee of $25,000 and his share of the excess, if any, of the organizational costs over finders fees, appraisal fees, attorney fees and other expenses of organizing the partnership he was to receive as compensation for his services only 2 percent of the partnership's cash flow. It is also interesting to note that his compensation was measured by the cash flow rather than the income (gross or net) generated by the venture.↩
12. Although the parties briefed other arguments with respect to the investment tax credit, based upon our finding of no profit motive we have determined that it is unnecessary to address these other arguments.↩
13. In Brannen v. Commissioner,78 T.C. 471, 493 (1982), affd. 722 F.2d 695 (11th Cir. 1984), this Court stated that the test was whether the stated purchase price unreasonably exceeded the value of the property, whereas in Hager v. Commissioner,76 T.C. 759, 774-775↩ (1981), this Court stated that the test was whether the principal amount of the nonrecourse indebtedness unreasonably exceeded the value of the property. We need not decide that issue here because both the purchase price and the principal amount of the nonrecourse note far exceeded the value of the films.